1  **BRIAN T. DUNN** (*NV BAR 7683*)
2  **JAMES A. BRYANT** (*CA BAR 255652*) (*Attorney will comply with LR IA 10-2*)
   **THE COCHRAN FIRM - CALIFORNIA**
3  4929 Wilshire Blvd. Suite 1010
4  Los Angeles, California 90010
   Telephone:  323-435-8205
5  Facsimile:   310-802-3829
6  Email:      bdunn@cochranfirm.com
7              jbryant@cochranfirm.com

8  *Attorneys for Asian American Entertainment Corporation, Limited*

9

10              **UNITED STATES DISTRICT COURT**
11                 **DISTRICT OF NEVADA**

12                              2:14-cv-01124-JAD-GWF

13  ASIAN AMERICAN
14  ENTERTAINMENT
    CORPORATION, LIMITED, a Macau          (1) DECLARATORY JUDGMENT
15  Corporation,

16                                          (2) EQUITABLE ACCOUNTING
           Plaintiff,
17                                          (3) MISAPPROPRIATION OF
18      vs.                                 TRADE SECRETS

19                                          (4) BREACH OF CONFIDENCE
    LAS VEGAS SANDS
20  CORPORATION, a Nevada                   (5) CONVERSION
21  Corporation, LAS VEGAS SANDS,
    LLC, a Nevada limited liability
22  company, VENETIAN CASINO               JURY DEMAND
    RESORT, LLC, a Nevada limited
23  liability company, SHELDON
24  ADELSON, an individual, WILLIAM
25  WEIDNER, an individual, DAVID
    FRIEDMAN, an individual and DOES
26  1 – 50.
27
28         Defendants.

                                 1
                            **COMPLAINT**

Plaintiff, Asian American Entertainment Corporation, Limited ("AAECL"), by its attorneys, and pursuant to, *inter alia*, Fed. R. Civ. P. 15(a)(1)(A), 8(d)(2), 19(a)(1) and/or 20(a)(2), and 17 U.S.C. § 501(b), hereby alleges the following for its Complaint against the above-named Defendants.

## JURISDICTION AND VENUE

### |Local Rule 8-1|

1.      This is a suit between a citizen of a foreign state and citizens of a state within the United States where the matter in controversy exceeds $75,0000.00. Therefore jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(2).

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1338(a), for actions arising under the Acts of Congress relating to copyrights, and for supplemental jurisdiction over related claims pursuant to 28 U.S.C. § 1367(a).

3.      Pursuant to 28 U.S.C. § 1391(a), venue is proper in this judicial district because all Defendants reside within the district.

## NATURE OF THIS ACTION

4.      This is an action for declaratory relief under 28 U.S.C. § 2201, and Sections 101 and 201 of the Copyright Act 28, U.S.C. §§ 101 and 201, seeking declarations: (a) that the Asian American Entertainment, Limited Tender Submission (the "Work") is a "joint work" within the meaning of 17 USC § 101; (b) Las Vegas Sands Corporation ("LVSC"), Las Vegas Sands, LLC ("LVS") or Venetian Casino Resort, LLC ("VCR") are co-authors and co-owners of the Work with Plaintiff thereof, under 17 USC § 201; (c) that U.S. Copyright Reg. No. TXu001894490 for the Work, which was obtained by Plaintiff in the names of both Plaintiff and LVSC, be amended, if necessary, to reflect the correct Las Vegas Sands entity that has authorship and ownership interest in the Work, in accordance

2

with 17 USC § 201(a); and (d) that Plaintiff owns indivisibly seventy-two and one half percent (72.5%) and Defendant Las Vegas Sands entity owns indivisibly twenty-one and one half percent (21.5%) co-ownership of the rights in the Work, under 17 USC §§ 201(a) and (d)(2).

5.      This is also an action in equity for an accounting from Defendants LVSC, LVS and/or VCR, of profits obtained from the use and benefit of the Work, and/or works adapted or derived therefrom, including, but not limited to, profits obtained from the use granted to Galaxy Entertainment Group Limited ("Galaxy"), through their joint venture, authorizing the use and adaptation of the Work, which eventually led to the procurement of lucrative Macau concessions contracts.

6.      Further, this is an action for money damages arising out of profits owed to Plaintiff by LVSC, LVS and/or VCR, for its use and benefit of the Work, which ultimately led to the Las Vegas Sands enterprise securing a Macau concessions contract that permitted it the rights to develop lucrative casino resorts. In addition, this is an action for breach of confidence and misappropriation of trade secrets as a result of Defendants surreptitiously disseminating to Galaxy, a major competitor to Plaintiff, the Work, that contained highly proprietary information, that was developed between Plaintiff and LVS over the course of several months. As a direct result of Defendants actions, as set forth in this Complaint, Defendants have profited significantly. Therefore, Plaintiff seeks both compensatory and punitive damages.

## PARTIES

7.      Plaintiff, Asian American Entertainment Corporation, Limited is a corporation organized under the laws of Macau, Special Administrative Region, People's Republic China.

8.      Defendant Las Vegas Sands Corporation is a Nevada corporation that is publicly trade on the New York Stock Exchange. At all times relevant to this

**COMPLAINT**

Complaint, LVSC is the parent company to all direct and indirect subsidiaries of the Las Vegas Sands enterprise, including but not limited to, Las Vegas Sands, LLC, Venetian Casino Resort, LLC, Sands China Ltd., and Venetian Macau. Beginning in 2004, LVSC controlled, directly or through its subsidiaries, defendants Las Vegas Sands, LLC and Venetian Casino Resort, LLC, and operated through defendants Las Vegas Sands, LLC and Venetian Casino Resort, LLC.

9.      Defendant Las Vegas Sands, LLC f/k/a Las Vegas Sands, Inc. is a Nevada limited liability company, and a wholly owned subsidiary of LVSC. Prior to the Las Vegas Sands enterprise corporate reorganization in 2004, LVS was a privately held corporation, and parent company to all Las Vegas Sands direct and indirect subsidiaries. LVS controls directly or through its subsidiaries Las Vegas Sands enterprise subsidiaries, including but not limited to Sands China Ltd. and Venetian Macau. At all times relevant LVSC was the controlling shareholder of LVS, owned 100% of common equity of LVS, and controlled LVS.

10.     Defendant Venetian Casino Resort, LLC a/k/a Venetian Venture Development, LLC is a Nevada limited liability company, and direct or indirect subsidiary of LVS and LVSC. VCR was formed in 1997, and controls directly or indirectly, through its subsidiaries, Las Vegas Sands entities, including but not limited to Sands China Ltd. and Venetian Macau. In 2009, VCR merged with Venetian Venture Development, LLC, acquiring all of Venetian Venture Development, LLC's assets and liabilities. At all times relevant LVS was the managing member of VCR, owned 100% of common equity of VCR, and controlled VCR.

11.     Defendant Sheldon Adelson ("Adelson") is a citizen of Las Vegas, Nevada. Adelson served as the Chairman of the Board for LVSC and LVS. Adelson acted as an agent of Defendants LVSC, LVS and VCR, at all times relevant to this Complaint.

12.     Defendant William Weidner ("Weidner") is a citizen of Las Vegas, Nevada. Weidner served as President and Chief Operating Officer of Defendant LVS from 1995 to 2004. Weidner also, served as President of Venetian Venture Development, LLC, at all times relevant to this Complaint. In addition, Weidner served as President of LVSC from 2004 to 2009. Weidner acted as an agent of Defendants LVSC, LVS and VCR, at all times relevant to this Complaint.

13.     Defendant David Friedman ("Friedman") is a citizen of Las Vegas, Nevada. Friedman served as the Assistant to the Chairman of the Board and Secretary of Defendants LVSC and LVS. Friedman acted as an agent of Defendants LVSC, LVS and VCR, at all times relevant to this Complaint.

14.     Plaintiff is informed and believe and thereon alleges that, at all times mentioned in this complaint, each of the Defendants was the agent, servant, employee, representative, subsidiary, affiliate, partner, member, associate or co-conspirator of one or more of the other Defendants, and all other things alleged have been done by Defendants were done in the course or scope of the relationship and with the knowledge and consent of their principal employers, owners, superiors, affiliates, masters, parent corporations, partners, members, associates, or representatives, except as otherwise specifically alleged within this Complaint.

## FACTUAL ALLEGATIONS

### A. The Government of Macau Announces That it Will Issue Three Gaming Concessions Contracts

15.     Since 1962 Stanley Ho Hung Sun ("Ho") and his entities held an exclusive right to the only gaming concessions contract to the then Portuguese controlled colony of Macau. In 1999, Portugal returned the colony of Macau to China, which would later be known as Macau Special Administrative Region of the People's Republic of China ("Macau").

16.     In early 2001, the government of Macau announced the formation of

the Public Tender Committee of Gaming Concessions (the "PTC"), which was granted the power to issue new gaming concessions and ending Ho's exclusive concession contract.

17.     In the fall 2001, the PTC announced that it would be tendering three gaming licenses accompanied with three concessions contracts through a tender submission process.

**B. AAECL Begins Searching for a Suitable Joint Venture Partner for the Purposes of Successfully Securing a Concessions Contract In Macau**

18.     Shortly after the PTC announced that it would be issuing new gaming concessions contracts in Macau, Dr. Shi-Sheng "Marshall" Hao ("Hao"), Chairman of AAECL, began searching for possible partners with significant experience as casino resort operators.

19.     In summer 2001, Hao began setting up numerous meetings with various casino resort operators including MGM, Wynn and defendant LVS, to inquire as to the possibility of forming a joint venture to take advantage of the opportunities that had materialized in Macau.

20.     In June 2001, Hao briefly met with Adelson, Chairman of the Board of LVS, in Las Vegas, Nevada, to discuss the business and financial opportunities that were being afforded in Macau with the proposed tendering of new concessions contracts. The two discussed what each party could bring to the joint venture. Upon conclusion of this meeting, with LVS showing significant interest in the partnership, the parties decided to table the matter until the PTC announced the specific process in which potential concessions tenderers would submit a proposed tender for the concessions contracts.

21.     In or around Fall 2001, after the PTC announced that it will be accepting tender submissions for the three concessions contracts, AAECL scheduled a follow up meeting with LVS in Las Vegas, Nevada, to meet with LVS

**COMPLAINT**

representatives and to negotiate an agreement to formalize a joint venture relationship between AAECL and LVS for the purposes of obtaining a Macau concessions contract.

## C. AAECL and LVS Agree to a Joint Venture for a Macau Gaming Concessions Contract

22.     In attendance at this meeting between representatives of AAECL and LVS were Hao of AAECL, Weidner, President of LVS, and Friedman, Assistant to the Chair of LVS (the "Fall 2001 Las Vegas Meeting").

23.     During the meeting the parties identified the unique assets that they each brought to a possible joint venture. LVS had years of experience in the casino business, as well operating resort casinos, including convention and trade show promotion, as evidenced by its Las Vegas operations. AACEL, brought access to capital for the development of the gaming resort, non-gaming economic investment opportunities, and was very experienced the Asian business markets, and Macau in particular.

24.     The fact that AAECL could bring capital to the joint venture would be critical, as it was very well known that during this period of time LVS was suffering from significant financial problems, facing large losses from its Las Vegas related businesses, and did not have any capital of its own or any access to capital to invest in AAECL's joint venture.

25.     At the conclusion of the meeting, the parties agreed that with AAECL and LVS joining together for the purpose of submitting a bid for a Macau concessions contract, their ability to offer this substantial investment to Macau and its economic development plans, provided the AAECL and LVS an advantage over other bidders in the tender submission process. Thus, AAECL and LVS agreed to proceed with the partnership in principle, which was to be formalized by written agreement between the parties evidencing their intent to form a joint venture for

**COMPLAINT**

the purpose of obtaining a Macau gaming concessions contract (the "Joint Venture").

26.     On or about October 18, 2001, after AAECL and LVS completed discussions about forming the Joint Venture, LVS, and through its wholly owned subsidiary Venetian Venture Development, LLC, ("VVD"), whose executive board also consisted Adelson, Weidner and Friedman, submitted to AAECL a letter agreement formalizing the terms of the Joint Venture. The letter agreement was executed by Weidner on behalf of LVS through VVD, and by Hao on behalf of AAECL. The October 18, 2001 letter agreement was later amended on November 15, 2001 (together with the October 18, 2001 letter agreement, the November 15, 2001 amendment shall be referred to herein as the "Letter Agreement.").

27.     The Letter Agreement provided that AAECL would work to obtain a concessions contract in Macau using a tender submission that was to be jointly created, drafted and revised by AAECL and LVS. Upon successfully obtaining a concessions contract, VVD would enter into a development agreement with AAECL, which set forth the development plans to build the proposed casino resort and related facilities. In addition, LVS and AAECL agreed that the casino resort would use the name "Venetian," and in exchange for the use of LVS's trademark, LVS and AAECL would enter into a management agreement, where LVS would receive 2% of the casino resort's gross annual revenue and 10% of its EBITDA (the "Macau Venetian Casino Resort"). Further, AAECL and VVD would jointly operate a casino, hotel and other related facilities.

28.     The Letter Agreement also identified that upon successfully obtaining a gaming license LVS through VVD would receive a 27.5% ownership interest in AAECL, as AAECL would serve as the entity that would own and operate the Macau Venetian Casino Resort. The 27.5 % figure identifies the ownership structure between AAECL and LVS. Further, this percentage ownership figure was

**COMPLAINT**

directly negotiated by Adelson and agreed upon by Adelson himself, on behalf of LVS.

**D. AAECL and LVS Author The AAECL Tender Submission.**

29.     After the Fall 2001 Las Vegas Meeting, both AAECL and LVS representatives, Hao, Weidner and Friedman, amongst others, immediately began authoring the tender submission proposal that was to be submitted to the PTC for consideration of one of three Macau concession contracts. Together, AAECL and LVS began developing plans, analyses, descriptions and data which were then authored into a number of different drafts that the parties reviewed, revised.  After several reviews of the drafts, the Parties agreed upon the contents of what would be the final version of the AAECL Tender Submission, that included an Executive Summary and Submission by Tender (the "AAECL Tender Submission" or the Work, as defined above). A true and correct copy of the AAECL Tender Submission is attached hereto as Exhibit A.

30.     The AAECL and LVS representatives were all well aware that the information included in the AAECL Tender Submission was to be kept in strict confidence, as the contents of the AAECL Tender Submission, its figures, plans and analysis was highly proprietary information that neither party wanted to allow its competitors to obtain. The trade secrets identified in the AAECL Tender Submission were so sensitive that at the initial request of LVS, both AAECL and LVS agreed to have AAECL Tender Submission drafted in Hong Kong, and further the parties hired body guards for the purpose of personally submitting the AAECL Tender Submission to the PTC.

31.     On or about December 7, 2001, representatives from AAECL, via escort by body guards, delivered the AAECL Tender Submission to the PTC for consideration of a Macau gaming concessions contract.

32.     In addition to AAECL and LVS, Galaxy, through its subsidiary

**COMPLAINT**

Galaxy Casino, S.A., also submitted a tender submission the PTC. Galaxy was direct competitor to AAECL, and was also vying for one of the three concession contracts being offered by the PTC.

**E.  The PTC Reviews 21 Applicants for Consideration of 3 Available Concessions Contracts**

33.      Upon the PTC accepting submissions for one of three Macau concessions contracts, it received twenty-one (21) tender submissions, all seeking one of the available gaming concessions contracts. During the PTC's review three of the twenty-one tender submissions were outright rejected immediately, while eighteen (18) other tenders, including AAECL, were invited to make a presentation before the PTC during a first round in person presentation.

34.      On or about January 4, 2002, Hao from AAECL, Weidner from LVS and Michael Jen ("Jen") from CDIB, gave the in-person tender submission presentation before the PTC. During this presentation Weidner identified the nature of the joint venture relationship between AAECL and LVS. More particularly, Weidner articulated LVS's commitment to working with AAECL to immediately develop and operate an impermanent high quality casino while a Venetian-style casino resort and convention center was being developed.

35.      Following the conclusion of the PTC's first round of reviews, of the remaining eighteen eligible gaming license candidates, the PTC invited nine (9) candidates to a second round in person presentation. AAECL/LVS was one of the 9 candidates who were invited to the second round, while Galaxy was excluded from this round.

36.      After it was announced that AAECL/LVS was one the 9 candidates who were invited to the PTC's second round review, the local Macau news publications, along with Hong Kong based news publications, had begun to tout that the AAECL/LVS team was the front runner to receive one of the three gaming

concessions contracts being offered.

37.     On or about January 15, 2002, in addition to those representatives who were present at the January 4, 2002, first round presentation, Adelson, of LVS, served as an active participant in the second round presentation to the PTC. Further, during this same period of time Adelson, became much more heavily involved in the dealings of the Joint Venture, than in previous months. While in Macau, Adelson, in the presence of Weidner, proposed to AAECL an extension of the relationship between LVS and AAECL for an additional thirty (30) days, which Hao accepted.

### F. LVS Unilaterally Terminates The Joint Venture with AAECL

38.     On or about December 10, 2001, the PTC announced that candidates that had submitted tender submissions would be permitted to restructure or merge until January 31, 2002. However, the PTC was clear that only the tender candidate itself, or a shareholder thereof, could restructure or merge with another tender candidate, and that if such a merger or restructuring occurred a supplemental submission must be submitted to the PTC for consideration of a concessions contract.

39.     On or about January 25, 2002, Weidner on behalf of LVS, submitted a fax to Hao, memorializing the January 15, 2002 agreement to extend the relationship between LVS and AAECL for an additional 30 days. The contents of the Weidner fax also reiterated that LVS was committed to exclusively furthering the Joint Venture.

40.     On or about January 30, 2002, AAECL was contacted by Galaxy with a proposition of discussing a potential merger of the two tender candidates, in which AAECL promptly notified LVS that it would entertain the discussion of Galaxy's proposal.

41.     During these merger discussions between Galaxy and AAECL,

11

**COMPLAINT**

Galaxy offered to merge with AAECL in exchange of a 60% majority ownership interest in AAECL. AAECL soon thereafter submitted to Galaxy a counteroffer. However, on or about January 31, 2002, prior to any further merger discussions between the Galaxy and AAECL, Galaxy informed AAECL that it had entered into an agreement with another party and was terminating the merger discussions.

42.     AAECL is informed and believes and thereon alleges that, unbeknownst to AAECL, sometime prior to January 15, 2002, and while AAECL was actively engaged in merger discussions with Galaxy, LVS representatives, Adelson, Weidner and Friedman were engaging in undisclosed and secretive discussions with Galaxy regarding the possibility of a joint venture between Galaxy and LVS, through LVS's subsidiary VVD, with the intent to exclude AAECL from the relationship. Further, during this same period of time Weidner continued to reiterate that LVS was committed to the Joint Venture, despite the fact that these representations were completely untrue.

### G. **AAECL Discovers that LVS Concealed from AAECL a Partnership Deal with Galaxy for the Purpose of Acquiring a Concessions Contract**

43.     During this same period of time the PTC gave notice that on February 8, 2002, it would be announcing the names of the tender candidates that would be award the three gaming concessions contracts.

44.     On or around February 6, 2002, Friedman, on behalf of LVS, faxed a letter to Hao formally terminating the Joint Venture between LVS, through VVD and AAECL.

45.     On or about February 8, 2002, the PTC announced the awardees of the three concessions contracts, which included Sociedade de Jogos de Macau, S.A. ("SJM"), Wynn Resorts, Limited ("Wynn Resorts") and Galaxy-LVS. Devastated from the news that they were not awarded a gaming license, AAECL was further shocked and surprised to discover that LVS was the party whom Galaxy had

**COMPLAINT**

entered into an separate agreement with, thus terminating merger discussions between the Galaxy and AAECL (the "Galaxy-LVS Partnership").

46.     However, prior to the PTC's announcement, and the formation of the Galaxy-LVS Partnership, it was well known that Galaxy, who was not invited to either a first or second round in person presentation, was all but out of the running for a concessions contract.

47.     In or around June 2002, Galaxy entered into a twenty year (21) term concessions contract with Macau (the "Galaxy-LVS Concessions Contract").

48.     AAECL was unaware of the details of the Galaxy-LVS Partnership, and on suspicion believed that LVS representatives may have shared highly confidential information to Galaxy, such as AAECL business plans and other proprietary analysis. This suspicion was further supported upon obtaining the terms of the Galaxy-LVS Concessions Contract, where AAECL discovered that Galaxy had agreed to spend $1.1 billion dollars in order to implement its plan, as well as references for plans to construct a Venetian-themed resort and convention center. These two terms identified in the Galaxy Concessions Contract, were two of the most important aspects of the AAECL-LVS Joint Venture.

49.     Although, AAECL suspected that LVS conveyed to Galaxy confidential information in order to form the Galaxy-LVS Partnership, AAECL did not believe that LVS specifically disseminated to Galaxy the actual AAECL Tender Submission, as this was a proprietary document that was to be kept in the strictest of confidences between the two parties.

## H. Galaxy Issues LVS a Subconcessions Contract

50.     As a result of years of corruption and the influence of criminal organizations, the Nevada Gaming Commission and Nevada State Gaming Control Board developed very stringent regulatory requirements that all of its gaming licensees must comply with. As such, in entering the Joint Venture, AAECL and

**COMPLAINT**

its shareholders were required to go through an exhaustive audit process in order for the Nevada Gaming Commission to approve the partnership between LVS and AAECL. Otherwise, should it have been discovered at a later date that AAECL was involved with organized crime, LVS risked losing its Nevada gaming license. This was more particularly described in the LVSC Initial Public Offering Prospectus ("LVSC Prospectus") under the Risks section stating, "[o]ur gaming operations and the ownership of our securities are subject to extensive regulation by the Nevada Gaming Commission, the Nevada State Gaming Control Board and the Clark County Liquor and Gaming Licensing Board. These gaming authorities have broad authority with respect to licensing and registration of our business entities and individuals investing in or otherwise involved with us."

51.     After the Galaxy-LVS Partnership was successfully awarded the Galaxy-LVS Concessions Contract to operate a casino resort and convention center, LVS representatives had growing concerns that Galaxy would not pass a similar audit that AAECL had undergone, due to Galaxy's rumored ties to criminal organizations. This was further supported by Adelson's own admission that he believed Galaxy had ties to Triads, a criminal organization of Chinese origin, during a recent legal action brought against LVS.

52.     Because of these concerns that such a partnership would potentially cause LVS to lose its gaming license in Nevada, LVS sought to terminate the Galaxy-LVS Partnership.

53.     In or around December of 2002, in a move by the government of Macau to accommodate LVS's desire to terminate the Galaxy-LVS Partnership, LVS, through its wholly owned subsidiary Venetian Macau S.A. ("VML"), Galaxy and the government of Macau entered into a sub-concessions agreement ("Subconcessions Contract"), whereby LVS would be granted a subconcessions contract from the Galaxy Concessions Contract to operate casino games in Macau.

**COMPLAINT**

LVS was not required to pay Galaxy any money for the Subconcessions Contract. while LVS states that it received the Subconcessions Contract without pay for agreeing to cover half of the $1.1 billion that Galaxy was required to spend on its development plans, however, it would become evident by AAECL's 2012 discovery, as to the true reason LVS was granted this Subconcessions Contract without paying monetary compensation.

54.     While the Subconcessions Contract was born out of the Galaxy Concessions Contract, the Subconcessions Contract operated separate and apart from the Galaxy Concessions Contract, and therefore even if the government of Macau were to terminate the Galaxy Concessions Contract, it would not result in termination of the Subconcessions Contract. With the government of Macau approving the Subconcessions Contract, it allowed LVS to avoid the possibility of losing its Nevada gaming license if in fact it were proven to be true that Galaxy had alleged ties to international criminal organizations.

55.     In response to the government of Macau permitting Galaxy to issue LVS the Subconcessions Contract, SJM and Wynn Resorts demanded that they be afforded the same opportunity as Galaxy and LVS. In April 2005, SJM sold a subconcessions contract to MGM Resorts International. Then in March 2006, Wynn Resorts sold a subconcessions contract to Melco-PBL for $900 million.

56.     By the end of 2006, Macau had issued a total of six separate gaming operators whom are currently operating over thirty (30) casinos.

**I.LVS Builds Its Macau Casino Resort Empire**

57.     Immediately upon execution of the Galaxy Concessions Contract, the Galaxy-LVS Partnership immediately began construction of the temporary casino resort located on Macau's waterfront named the Sands Macau. The Sands Macau was a unique concept developed by AAECL and LVS, as the Sands Macau would serve as a temporary gaming casino until a Venetian-style resort casino was

COMPLAINT

completed. Thereafter, both the Sands Macau and Venetian-style resort casino would both continue to operate. AAECL and LVS developed the concept on the belief that the quicker they could get some form of gaming operation up and running, the quicker the parties would be able to establish their presence in Macau, and most importantly begin to realize profits.

58.     In or around May 2004, and at a cost to LVS of $260 million, LVS completed the construction of the Sands Macau. Astoundingly, within less than one year LVS had earned back its entire investment in the Sands Macau.

59.     In or around August 2007, LVS completed the construction of the Venetian-style casino resort and convention center, originally proposed in the Joint Venture, and named the Venetian Macau Resort-Hotel.

60.     In or around April 2012, LVS completed another casino resort and convention center named the Sands Cotai Central, which included the acquisition of the Conrad Macau, Holiday Inn Macau and Sheraton Macau.

### J.  **AAECL Discovers that Galaxy-LVS Submitted a Tender Submission that was Nearly Identical to the AAECL Tender Submission**

61.     In or around November 2011, Jorge Menezes ("Menezes"), counsel for AAECL in a pending matter before the court of Macau, received a copy of what purported to be a document dated February 1, 2002, titled "Galaxy Casino Company Limited Subsequent Proposal for the First Public Tender for a Concession for Operating Games of Chance or Other Games in Casino in Macau," and a document dated February 6, 2002, from VVD to Galaxy titled "RE: Proposal to Develop a Casino in Macau." As Menezes began reviewing Galaxy's subsequent proposal, he immediately realized that this document was in fact the tender submission submitted to the PTC by Galaxy-LVS, identifying the Galaxy-LVS Partnership, and their proposed development plans in Macau (the "Galaxy-LVS Tender Submission" or the "Work Derivative"). A true and correct copy of

**COMPLAINT**

the Galaxy-LVS Tender Submission is attached hereto as <u>Exhibit B</u>.

62.     Prior to the end of 2011, AAECL had absolutely no knowledge of the terms of the contractual relationship between Galaxy and LVS, nor did they have any idea what subsequent proposal had been submitted to the PTC on behalf of Galaxy-LVS, evidencing the Galaxy-LVS Partnership or the proposed details of their development plan, as this knowledge would have been impossible to know given that tender submissions to the PTC were completely confidential and unavailable to anyone outside of the PTC.

63.     After reviewing the documents, Menezes promptly forwarded the Galaxy-LVS Tender Submission and accompanying VVD-Galaxy proposal to Hao of AAECL.

64.     Upon reviewing the Galaxy-LVS Tender Submission, Hao was instantly floored by what he had discovered. Not only was it clear that LVS had disclosed to Galaxy the highly proprietary AAECL Tender Submission created by AAECL and LVS, the Galaxy-LVS Tender Submission, was nearly an **EXACT REPLICA**, notwithstanding the omission of AAECL references which were replaced by Galaxy, and references to the CDIB financing. As Hao reviewed the Galaxy-LVS Tender Submission he was able to compare it with the AAECL Tender Submission, and literally word for word, it described the exact development proposal that AAECL had submitted to the PTC, including, specific details related to the cost of the development project and its overall impact on Macau, the construction of a temporary resort casino, construction of a Venetian-style resort casino and convention center, and the partnership with Jerde Partnership International.

65.     While AAECL suspected that LVS representatives, Adelson, Weidner and Friedman, had divulged some aspects of the Joint Venture that were to be kept in confidence, AAECL never once thought the actual AAECL Tender Submission,

and all of its highly proprietary information, including project capital commitments, development plans including phases and costs, the cutting edge idea of temporary resorts, specific market research and analysis, marketing ideas, business models, and the use of specific architects, had been given to Galaxy. This discovery that LVS, through its representatives Adelson, Weidner and Friedman, had divulged proprietary information was a complete betrayal of trust and a misappropriation of a proprietary document whose contents were clear trade secrets.

66.     Again, the proprietary information identified in the Work was so secretive and cutting edge that AAECL and LVS drafted the document in Hong Kong, and further AAECL was escorted by several body guards, in order to protect its contents from falling in the hands of its competitors, such as Galaxy, during the date of submission of the Work to the PTC. This was a document that AAECL and LVS had spent months researching, preparing, and revising. It was now evident to AAECL, that not only did LVS, and its representatives, misappropriate the Work's proprietary information by providing to Galaxy, LVS manipulated the AAECL Tender Submission, by creating the Work Derivative for the purpose of directly competing against its co-author and former partner, they did so during the PTC tender submission process.

67.     In order for the Galaxy-LVS Partnership to be considered by the PTC, it was required to submit a subsequent tender submission evidencing their proposed development plans. Had the Galaxy-LVS Partnership failed to submit to the PTC the Work Derivative, it would have been ineligible for consideration of a gaming license and concession contract. Thus, the sole reason why the Galaxy-LVS Partnership was awarded the Galaxy-LVS Concessions Contract, was as a direct result of the Galaxy-LVS Tender Submission, which was nearly an exact replica of the AAECL Tender Submission. This was further reiterated Jorge

**COMPLAINT**

Oliveira, a high ranking PTC member and top legal advisor within the PTC, who publicly stated in a Nevada court proceeding that had LVS not joined Galaxy, and had Galaxy not followed the proper procedures for resubmitting a tender submission to the PTC, the Galaxy would not have received a concessions contract, thus precluding LVS from having received the Subconcession Contract from Galaxy.

**K. LVS's Joint-Ownership of the Work May Have Changed During the LVS Enterprises' Many Reorganizations**

68.    In 2001, when AAECL initially proposed the possibility of engaging in a joint venture with LVS, AAECL representatives directly reached out to LVS representatives. Prior to 2004, LVS was a privately held company, and served as the parent company to all direct and indirect wholly owned LVS subsidiaries, including VCR, VVD and VML. It was during this time that AAECL's intent was to engage in business directly with LVS.

69.    As the discussions regarding an AAECL-LVS joint venture progressed, LVS informed AAECL that it would be using a subsidiary VVD, to serve as LVS's holding company for this joint venture. However, AAECL was always under the impression that the joint author and joint owner of the copyright interest in the Work was VVD's parent company LVS, as it was LVS executives, Weidner, Friedman and Adelson that authored and collaborated with AAECL to create the Work.

70.    In or around August 2004, LVS began a major reorganization of the enterprise with the formation of LVSC.

71.    On or about December 20, 2004, LVSC completed an initial public offering of its common stock on the New York Stock Exchange. Shortly before completing the initial public offering LVSC acquired 100% of LVS's capital stock. Upon completion of the LVSC IPO, LVSC served as the parent company to all

**COMPLAINT**

direct and indirect wholly owned LVS subsidiaries, including LVS.

72.     On information and belief, upon LVSC acquiring 100% of LVS's capital stock, LVS transferred to LVSC its assets it held, including its copyright ownership interest in the Work.

73.     In 2005, LVS was converted from a Nevada corporation to a Nevada limited liability company.

74.     In 2009, through further internal reorganizing, VVD merged with VCR, and as a result of the VCR-VVD merge all assets held by VVD were now owned by VCR.

**L.   LVS's Profits Explode as a Direct Result of Obtaining the Subconcessions Contract Solely Procured By Use of a Derivative of the Work**

75.     As stated above, the Galaxy-LVS Concessions Contract and the Subconcessions Contract were only awarded to Galaxy and LVS as a result of Galaxy-LVS submitting the Work Derivative to the PTC.

76.     With the events of September 11, 2001, having a significant impact on the U.S. tourism, and more particularly a devastating impact on Las Vegas casinos, LVS's Las Vegas resort casino based revenues were faltering. However, despite a deep recession in the Las Vegas economy, and as a direct result of the Subconcessions Contract, merely two years after the opening of the Sands Macau, LVS's overall gaming revenues had increased from $1.6 billion in 2001 to over $6 billion by 2006.

77.     In or around 2009, LVS's Macau casino resort operations had become so lucrative, LVS engaged in another reorganization of its enterprise, with the formation of Sands China. Sands China, an LVS subsidiary, completed its initial public offering on the Hong Kong Exchange. Sands China, served as an LVS subsidiary with a 72% ownership interest through the LVS wholly owned

subsidiary Venetian Venture Development Intermediate II ("VVDII"), and parent company to all Macau subsidiaries, including Venetian Macau, S.A. and all other LVS Macau resort casino related holding companies.

78.     By the Fiscal Year End 2013, LVS reported its overall operations' net revenue increased 23.7% to a record $13.77 billion, its adjusted EBITDA increased 25.6% to a record $4.76 billion, and its net income rose 51.3% to an amount of $2.31 billion.

79.     LVS's record earnings were in large part due to its Macau resort casino operations, which were only made possible through the Work Derivative and subsequent Subconcessions Contract. More particularly it was reported by LVS that, through its wholly owned subsidiary Sand China, its Macau operations' net revenue increased 37% to $8.96 billion, its adjusted EBITDA increased 46.5% to $2.9 billion and its net income increased 79.7% to $2.21 billion. In 2013, LVS's Macau casino resort operations accounted for **65% of LVS's total operations' net revenue, 61% of LVS's adjusted EBITDA and 95.5% of LVS's total net income**.

80.     Upon information and belief, the LVS Enterprise is a vertically structured enterprise. All direct and indirect profits derived from the Work Derivative flow directly through VCR, LVS and LVSC, as these three entities serve as the highest tiered entities in the LVS Enterprise (the "LVS Enterprise Entity" or "LVS Enterprise Entities"). A true and correct copy of LVS's organizational structure in 2009, as identified in the Sands China IPO Prospectus, as Exhibit C.

81.     Upon information and belief, VCR, LVS and LVSC make all their profits directly from the revenues generated by its subsidiaries, which include all Macau gaming subsidiaries, whose operations and profits were only made possible as result of the Work Derivative. This was more particularly described in LVSC

Prospectus, "[LVSC] is a holding company with no material business operations of our own. Our only significant asset is the capital stock of our subsidiaries. We conduct virtually all of our business operations through our direct and indirect subsidiaries. Accordingly, our only material sources of cash are dividends and distributions with respect to our ownership interests in our subsidiaries that are derived from the earnings and cash flow generated by our operating properties." Thus, VCR, LVS and LVSC directly and indirectly profit from the operations of its direct and indirect subsidiaries, including its Macau subsidiaries.

82.     Upon information and belief, LVSC, LVS and VCR profits arising from the use of the Work Derivative, have exceed $20 billion since the Galaxy-LVS Concessions Contract and the Subconcessions Contract were granted by the PTC. Meanwhile, AAECL, a joint owner of the Work has never received a dime, and Plaintiff continues to suffer financially as a result. The LVS Enterprise, whether determined to be through LVSC, LVS, or VCR, has a duty to AAECL, and to pay AAECL its full share of past, current and future profits attributable directly or indirectly to, *inter alia*, the use and/or adaptation or derivatives of the Work. Further, the LVS Enterprise, Adelson, Weidner and Friedman, must be held accountable for misappropriation of trade secrets and breach of confidence.

## FIRST CLAIM FOR RELIEF

### Declarations of Joint Work and Copyright Ownership

(Against Defendants LVSC, LVS and VCR)

83.     Plaintiff repeats and incorporates by reference the allegations set forth in the Complaint, as set forth herein.

84.     Plaintiff and Defendant LVSC, or alternatively an LVS Enterprise Entity, were both authors of the Work. Further, Plaintiff and the LVS Enterprise Entity contributed independently copyrightable content thereto, with the intention that their respective contributions be merged into inseparable and interdependent

parts of a unitary whole.

85.     Both Plaintiff and the LVS Enterprise Entity knew and understood the Work was a "joint work," prior to and during the creation of the Work, and they both intended that they be considered "co-authors" thereof, as evidenced, by the Letter Agreement, entered into between Plaintiff and LVS's subsidiary, VVD. Plaintiff and Defendant LVS further articulated each party's ownership interest in the Work, with AAECL owning 72.5 percent and LVS owning 27.5 percent.

86.     The Work is a "joint work" within the meaning of Section 101 of the Copyright Act [17 U.S.C. § 101].

87.     Whereas, copyright ownership vests in the authors of a work, and the authors of a joint work are considered co-owners of the Work, under Section 201(a) of the Copyright Act [17 U.S.C. § 201(a)], the copyright in the Work vested in both Plaintiff and the LVS Enterprise Entity, and they were co-owners thereof.

88.     On May 2, 2014, the United States Copyright Office registered Plaintiff's joint work entitled "AAECL Tender Submission" and issued it Reg. No. TXu001894490, now that the Work's proprietary information was no longer secret by virtue of Defendants' acts.

89.     As a co-owner of the Work, Plaintiff and the LVS Enterprise Entity each have the right to exploit the Work independently of the other, including the use of derivative works of the Work.

90.     As stated in the allegations above, the LVS Enterprise is a complex network of direct and indirect subsidiaries, wholly owned by three entities that sit at the top of the LVS Enterprise, VCR, which directly owned by LVS, which is directly owned by LVSC.

91.     At the time the Work was being developed and authored, LVS executives Adelson, Friedman and Weidner, worked hand in hand with AAECL executives, for the purpose of creating a joint-work that would be submitted to the

PTC for consideration of a concessions contract.

92.      During this time Plaintiff was under the belief that LVS was the joint author and co-owner, despite the fact that LVS elected to use VVD as the holding company that would oversee Macau resort casino operations.

93.      Since the Work was created, the LVS Enterprise has undergone a number of reorganizations, including the 2004 creation of LVSC, a publicly traded company, that a 100% interest in LVS, and the 2009 merger of VCR and VVD. Because of the complexity of these transactions, while Plaintiff believes that LVSC is the current co-owner of the Work, it may not necessarily be clear at this time, given the unknown nature of how assets may have been transferred during these reorganizations. However, it is certain that the joint ownership of the Work lies with either LVSC, LVS or VCR.

94.      Plaintiff seeks a Declaratory Judgment against Defendants LVSC, LVS and VCR, pursuant to 28 U.S.C. § 2201, decreeing that the Work is a "joint work" under 17 U.S.C. § 101; that the actual LVS Enterprise Entity was a co-author of the Work, and co-owner thereof, under 17 U.S.C. § 201(a); that AAECL and the correct LVS Enterprise Entity are qualified copyright claimants with respect to the Work, under 37 C.F.R. § 202.3(a)(3), when the Work was first fixed in a tangible medium expression; U.S. Reg. No. TXu001894490 be supplemented to reflect the actual LVS Enterprise Entity joint author, co-owner and copyright co-claimant; that Plaintiff holds an indivisible 72.5% co-ownership interest therein; and that the proper LVS Enterprise Entity holds an indivisible 27.5% co-ownership interest therein;

## SECOND CAUSE OF RELIEF

### Equitable Accounting

### (Against Defendants LVSC, LVS and VCR)

95.      Plaintiff repeats and incorporates by reference the allegations set forth

in the Complaint, as set forth herein.

96.     Co-Owners of a copyrighted work are akin to tenants-in-common, with each owner having an undivided, independent right to use the work, subject to a duty to account for profits to the other co-owner(s).

97.     As a co-owner of the Work, Plaintiff has a right to an accounting from Defendant LVSC, or alternatively an LVS Enterprise Entity, of any and all direct or indirect profits obtained as a result of the LVS Enterprise Entity's exploitation of the Work, and to payment of its seventy-two and one half percent (72.5%) share of such profits. This duty requires the LVS Enterprise Entity to disclose to Plaintiff all direct and indirect income it has collected from such exploitation, and to pay Plaintiff its 72.5% share of the profits.

98.     The LVS Enterprise Entity's duty to account to Plaintiff, includes a duty to account for profits obtained, derived or flowing from, the Work Derivative, the subsequent Galaxy Concession Contract and Subconcessions Contract, and from the profits derived by all Macau resort casinos as a result of the Subconcessions Contract.

99.     The precise nature and extent of the LVS Enterprise Entity's income attributable to the Work are unknown to Plaintiff at the present time, and the LVS Enterprise Entity's direct and indirect profits cannot be determined without an accounting of its transactions related to, the Work, Work Derivative and profits derived from its Macau resort casinos. Moreover, the facts and accounts presented are so complex that adequate relief cannot be obtained at law, and an investigation of the LVS Enterprise Entity's accounts is necessary in order to affect justice between the parties, and establish the value of Plaintiff's interests.

100.     Plaintiff seeks an order from the Court that the LVS Enterprise Entity render an accounting to Plaintiff of the amounts owed, as well as a judgment against the LVS Enterprise Entity, for a sum to be determined in the accounting,

1    but in an amount no less than $5,000,000,000, with prejudgment and post-

2    judgment interest, as allowed by law.

3         101.    Further, Plaintiff seeks an order from the Court that the LVS

4    Enterprise Entity shall continue to account for any future profits derived from its

5    use of the Work.

6    **THIRD CLAIM FOR RELIEF**

7    **Misappropriation of Trade Secrets**

8    **(Against All Defendants)**

9         102.    Plaintiff repeats and incorporates by reference the allegations set forth

10   in the Complaint, as set forth herein.

11        103.    As alleged above, the AAECL Tender Submission, created by

12   Plaintiff and LVS, contained highly proprietary information including project

13   capital commitments, development plans including phases and costs, the cutting

14   edge idea of temporary resorts, specific market research and analysis, marketing

15   ideas, business models, and the use of specific architects (the "Proprietary

16   Contents").

17        104.    The Proprietary Contents in the AAECL Tender Submission were

18   considered so secretive that AAECL and LVS representatives went to extreme

19   lengths to guard this content, including the drafting of the work in Hong Kong, and

20   hiring body guards in order to protect the Proprietary Contents from falling into the

21   hands of its competitors.

22        105.    Plaintiff and Defendants, and each of them, all agreed that the

23   Proprietary Contents were to be kept with the strictest confidence amongst the

24   parties.

25        106.    Defendants were aware that the AAECL Tender Submission and the

26   Proprietary Contents could not be divulged or disseminated to any other person or

27   entity without Plaintiff's express approval.

28

**COMPLAINT**

107.    In or around November 2011, Plaintiff discovered that, unbeknownst to it, Defendants, and each of them, divulged and disseminated the AAECL Tender Submission and its Proprietary Contents to Galaxy, a direct competitor to AAECL, without Plaintiff's permission.

108.    Defendants' divulgence and dissemination of the AAECL Tender Submission and its Proprietary Contents to Galaxy, for the purpose of entering a new partnership with Galaxy, and diverting from Plaintiff any possible profits derived from the AAECL Submission and its Proprietary Contents, constitutes misappropriation of Plaintiff's intellectual property.

109.    As a result of said misappropriation, Plaintiff has suffered damages in excess of $5,000,000,000, with prejudgment and post-judgment interest, as allowed by law. Additionally, such misappropriation has been willful and malicious entitling Plaintiff to exemplary and/or punitive damages pursuant to Nev. Rev. Stat. §42.001.

110.    Further, as a result of Defendants' willful and malicious acts, Plaintiff is entitled to attorneys' fees and costs related to the same.

### FOURTH CLAIM FOR RELIEF

**Breach of Confidence**

**(Against All Defendants)**

111.    Plaintiff repeats and incorporates by reference the allegations set forth in the Complaint, as set forth herein.

112.    Plaintiff and Defendants devised and created the AAECL Tender Submission and its Proprietary Contents under the strictest of confidence.

113.    Again, the Proprietary Contents in the AAECL Tender Submission were considered so secretive that AAECL and LVS representatives went to extreme lengths to guard this content, including the drafting of the work in Hong Kong, and hiring body guards in order to protect the Proprietary Contents from

1  falling into the hands of its competitors.

2    114.    Defendants knew that Plaintiff expected its AAECL Tender

3  Submission and the Proprietary Contents to be kept in strict confidence.

4    115.    Defendants divulged and disseminated the AAECL Tender

5  Submission and the Proprietary Contents to Galaxy who, in collaboration with

6  Defendants, created the Galaxy-LVS Tender Submission, which was a near

7  derivative replica of the AAECL Tender Submission.

8    116.    Plaintiff did not give permission to Plaintiffs to disclose the Tender

9  Submission or the Proprietary Contents to any third party.

10

11    117.    Plaintiff was damaged as a direct and proximate result of Defendants'

12  conduct, because the AAECL Tender Submission and the Proprietary Contents

13  were utilized to obtain the Galaxy-LVS Concessions Contract and Subconcessions

14  Contract, and made at the exclusion of Plaintiff, and Plaintiff was never

15  compensated. Plaintiff has suffered damages in amount to be determined at trial.

16    118.    This knowing and purposeful disregard for Plaintiff's rights is

17  oppressive and malicious. Plaintiff is informed and believes that Defendants had

18  advanced knowledge of these oppressive and malicious acts and consciously

19  disregarded them or authorized, ratified or perpetuated the oppressive and

20  malicious acts themselves. As a result of such, Plaintiff is entitled to exemplary

21  and/or punitive damages in an amount to be proven at trial pursuant to Nev. Rev.

22  Stat. §42.001.

23                        **FIFTH CLAIM FOR RELIEF**

24                              **Conversion**

25                        **(Against LVSC, LVS and VCR)**

26    119.    Plaintiff repeats and incorporates by reference the allegations set forth

27  in the Complaint, as set forth herein.

28    120.    Beginning in 2006, continuing through to the present, and, upon

information and belief LVSC, LVS and VCR have converted, for their own use, all direct and indirect profits attributable to the use and licensing of the Work, which were due, owed and properly belonged to Plaintiff, as a joint owner of the Work.

121.   Conversion by Defendants LVSC, LVS and VCR of Plaintiff's rightful share of royalties and/or profits were intentional, were facilitated by, and accomplished through Defendants' foregoing acts of misappropriation and concealment, notwithstanding the existence of a confidential relationship.

122.   Defendants' knowing and purposeful disregard for Plaintiff's rights is oppressive and malicious. Plaintiff is informed and believes that Defendants had advanced knowledge of these oppressive and malicious acts and consciously disregarded them or authorized, ratified or perpetuated the oppressive and malicious acts themselves. As a result of such, Plaintiff is entitled to exemplary and/or punitive damages in an amount to be proven at trial pursuant to Nev. Rev. Stat. §42.001. In addition to compensatory damages, Plaintiff is also entitled to pre-judgment and post judgment interest, as permitted by law, Plaintiff's attorneys' fees and the costs of this action, and the imposition of a constructive trust on all of Defendants' direct and indirect profits arising from or relating to the Work, including, but no limited to, income arising from the use or licensing of the rights therein for the Work.

## PRAYER FOR RELIEF

A.   That the Court enter a Declaratory Judgment in favor of Plaintiff, and against the LVS Enterprise Entities, decreeing as follows:

i.   That the Work is a "joint work" under 17 U.S.C. § 101;

ii.   That either LVSC, LVS or VCR was a joint author of the Work, and co-owner of the Work, under 17 U.S.C. § 201(a);

iii.   That Plaintiff and the correct LVS Enterprise Entity are qualified copyright co-claimants with respect to the Work, under 37 C.F.R. §

202.3(a)(3), when the Work was first fixed in a tangible medium of expression;

      iv.    That U.S. Reg. No. TXu001894490 be supplemented if necessary by the Copyright Office, to reflect the status of the correct LVS Enterprise Entity joint author, co-owner and copyright co-claimant;

      v.    That Plaintiff owns an indivisible 72.5% ownership interest in the Work;

      vi.    That the correct LVS Enterprise Entity owns an indivisible 27.5% ownership interest in the Work; and

    B.   That the Court order the correct LVS Enterprise Entity to render an accounting to Plaintiff of the amounts owed to Plaintiff from profits derived from the use of the Work and the Work Derivative by virtue of its status as a copyright co-owner.

    C.   That Judgment be entered against the correct LVS Enterprise Entity for a sum to be determined in the accounting, but in an amount no less than $5,000,000,000, together with prejudgment and post judgment interest, as provided by law.

    D.   That the correct LVS Enterprise Entity continues to account for all future profits owed to Plaintiff as result of profits derived from the use of the Work or the Work Derivative.

    E.   That the Court imposes a constructive trust on the correct LVS Enterprise Entity for profits derived for the benefit of Plaintiff.

    F.   That Judgment be entered against Defendants for damages in amounts to be determined through discovery, or at trial, resulting from Defendants' misappropriation of trade secrets, together with post-judgment interest, attorneys' fees and costs of this action as provided by law.

    G.   That Judgment be entered against Defendants for damages in amounts to be determined through discovery, or at trial, resulting from Defendants' breach

**COMPLAINT**

of confidence, together with post-judgment interest, attorneys' fees and costs of this action as provided by law.

      H.  That Judgment be entered against Defendants for damages in amounts to be determined through discovery, or at trial, resulting from Defendants' conversion, together with post-judgment interest, attorneys' fees and costs of this action as provided by law

      I.  That exemplary and/or punitive damages be assessed against Defendants pursuant to Nev. Rev. Stat. §42.001, in amounts to be determined at trial, for their misappropriation of trade secrets, breach of confidence and conversion.

      J.  For other such and further relief as the Court deem proper and just.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

**COMPLAINT**

1

2    DATED: July 9, 2014            Respectfully submitted,

3

4                                   THE COCHRAN FIRM - CALIFORNIA

5

6                                   By: ___/s/ Brian T. Dunn_____

7                                   Brian T. Dunn (NV Bar No. 7683)

8                                   James A. Bryant (CA Bar No. 255652)
                                    4929 Wilshire Blvd. Suite 1010
9                                   Los Angeles, CA 90010
                                    Telephone: (323) 435-8205
10                                  Fax: (310) 802-3829

11

12                                  *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

**EXHIBIT A**

# Asian American Entertainment Corporation, Limited

## TENDER SUBMISSION

**in accordance with the
Procedures for the First Public Tender to Grant Concessions
to operate Casino Games of Chance**

## EXECUTIVE SUMMARY

1.   <u>Introduction</u>

Asian American Entertainment Corporation Limited's (AAEC) fully financed bid for a casino license in Macau represents a powerful opportunity for Macau to revitalize its casino tourism based economy and to fundamentally strengthen, broaden and diversify its entire economic base.  At its completion, AAEC's themed destination resort alone would:

(i)     bring over US$1.1 billion (8.8 billion patacas) of investment;
(ii)    employ over 7,000 people; and
(iii)   generate as much as a 20% boost to Macau's GDP.

The truly differentiating factor of AAEC's bid, however, will be the additional US$780 million (6.24 billion patacas) of investment, additional 6,330 jobs and additional 16.2% increase to Macau's GDP brought by synergistic investments through China Development Industrial Bank ("CDIB") in non-tourism related aspects of Macau's economy.

AAEC's vision begins with a world class resort that will attract tourists to:

(i)     its all suite rooms;
(ii)    its themed architecture;
(iii)   the exciting entertainment along its festive Venetian Grand Canal;
(iv)    the tropical river and waterfalls of its pool and spa complex;
(v)     shopping, dining and live entertainment showrooms; and
(vi)    world-class exhibition and conference facilities.

AAEC's vision begins with a temporary facility, follow with a comprehensive trade show exhibition and convention center of over 45,000 sq.m. (master planned to expand to almost 100,000 sq.m. as Macau's export economy expands).  This facility, combined with our convention and tradeshow expertise, will enable us to stimulate midweek tourist trade in Macau.  Importantly, this convention and exhibition center will present the products of China to the world's buying community.

CDIB has committed no less than US$500 million (4 billion patacas) to immediately begin the development of our vision.  CDIB also commits to direct investments in trade facilitation infrastructure (including 24 hour V-bank services, establishment of a universal bank for Macau and building a trade logistical center in Macau) and its investment in high-tech production facilities will contribute to the establishment of Macau as a trade center.  Tourism and trade will be further supported by CDIB's investment in a Macau-based airline.

These infrastructure investments, when combined with the new proposed destination resort and exhibition facilities, Macau's free trade zone and tax exempt port facilities position Macau as a premier trading center for Southeast Asia.  In short, we are proposing an integrated economic development program to significantly diversify and expand Macau's economy.

2.    **Description of Sponsors**

**AAEC**

AAEC is a Macau corporation whose principal shareholders and sponsors include China Development Industrial Bank (Taiwan), The Venetian Casino Resort (Las Vegas, Nevada), and a broad-based group of leading local Macau residents.

The principal sponsors of AAEC are established corporations with leading reputations in their respective business operations. The sponsors have substantial capital resources, proven experience in the development and operation of a large-scale casino, convention and entertainment complex, and have a strong desire and commitment to be a leading force for the growth and development of Macau as an international business, cultural, and entertainment center.

**CDIB**

CDIB is a leading financial services and development bank based in Taiwan. CDIB is a publicly traded corporation. The Bank's principal activities involve the investment and financing of some of the largest companies in the technology industries. CDIB has revenues and profits of US$610 million (5.1 billion patacas) and US$400 million (3.3 billion patacas), respectively, for the year ended 31 December 2000. CDIB has a market capitalization of US$4.6 billion (38.4 billion patacas) and is rated BBB+ by S&P. CDIB has issued a commitment to finance all project costs.

**The Venetian Resort**

The Venetian Resort owns and operates the Venice-themed resort situated on the Las Vegas Strip in Las Vegas, Nevada. The Venetian (Las Vegas) includes 3,036 luxury suites, a gaming facility of 116,000 sq. ft., an enclosed retail, dining and entertainment complex of approx. 450,000 sq. ft. and a meeting and conference facility of approx. 500,000 sq. ft. The Venetian (Las Vegas) is physically connected to the Sands Expo and Convention Center, one of the largest trade show and convention facilities in the U.S., and together, have approximately 1,500,000 sq. ft. of exhibition and meeting space.

The Venetian cost over US$1.3 billion (over 10 billion patacas) to build and opened in 1999. The property generates US$590 million (4.72 billion patacas) in net revenues for the year ended 31 December 2000 and is one of the most successful casino establishments in Las Vegas. The Venetian is owned by Mr. Sheldon G. Adelson, one of the most successful and wealthy businessmen in the U.S. Mr. Adelson's numerous privately-held corporations range from technological enterprises to leisure resorts – among them, the Sands Expo and Convention Center, the only privately-financed, developed and operated convention center in the U.S. In April of 1995, as Chairman of the Board and C.E.O. of the Interface Group, Mr. Adelson and his partners pioneered the largest transaction in the history of the worldwide trade show industry by selling Interface's trade show division, including COMDEX, to a Japanese corporation for nearly US$900 million (7 billion patacas).

<u>Other Sponsors</u>

Sponsors include leading residents of the region including Macau.

<u>Professional Advisor</u>

SG Cowen Corporation ("SG Cowen"), a wholly-owned subsidiary of Societe Generale, is the financial advisor to AAEC. SG Cowen is one of the world leaders in investment banking and related financial services to the gaming and lodging industry.

3.     <u>**Overview of Gaming, Convention and Entertainment Project**</u>

<u>Overview</u>

Our vision is a master-planned multi-phased casino, tradeshow/convention and entertainment complex with a 100,000 sq.m. convention facility, a 3,000 all suite hotel and 15,000 sq.m. of casino space.

<u>Phase I</u>

Initially, Phase I would include 500 luxury suites, 45,000 sq. meters of exhibit, conference and multi-purpose complex which will be expanded as the convention and exhibition market for Macau is developed. The facility will include 5-7 restaurants of Chinese and Western styles. Similar to the retail facilities at the Venetian, Las Vegas, the complex would include a themed shopping complex. In addition, a live entertainment showroom and health club, spa and gymnasium is planned. The outdoor areas would include tropical gardens, lagoons, pools, waterfalls and other amenities.

The casino hall will be reflective of a large, luxurious, Las Vegas-style casino with a wide mix of gaming tables and slot machines. It will be surrounded by restaurants, entertainment venues and shopping experiences. In addition, ten VIP casino halls will be developed and controlled by the casino operator. The project will include back of the house support facilities and parking for 300 cars.

<u>Future Development</u>

Subsequent additional phases of development will include the expansion of the convention and exhibition space, additional five-star luxury hotel rooms, restaurants, stores, and entertainment room. This additional investment will be made as the market demands.

<u>Proposed Site</u>

No definitive site for the project has been selected. However, AAEC has identified a 160-acre plot of reclamation land on the southeastern part of the Taipa Island. Located just east of the Rotunda da Estrada do Istmo, it is about 5 minutes from the airport and the proposed new ferry terminal. It also is close to the Lotus Bridge that connects Macau with China. This land links Mainland China to Macau and Macau's airport and passenger port transportation infrastructure, and provides land parcels large enough for Las Vegas-style tourist attractions. By bridging Mainland China to

the transportation amenities of Macau, the new development would provide convenient access for tourists, and act as a cluster of attractions to develop into a tourism magnet for Macau.  [*Refer to enclosed map*]

<u>Market Positioning</u>

The Venetian Project will appeal to a diverse group of customer segments.  The property will offer a quality entertainment experience superior to anything currently available in Asia.  The property will appeal to the existing Hong Kong and Macau markets and, additionally, will expand the existing customer base by providing a safe, attractive Las Vegas-quality environment.  The property will specifically target business and convention travelers from all over Asia as well as higher-budget customers seeking a quality destination vacation experience.  The hotel suites proposed for the project will enable the casino to aggressively market customers who will stay for longer periods than the average visitation of existing customers to Macau.

With our vast knowledge of the Asian market, combined with our extensive work with international tradeshow companies and our experience with airlines and the travel industry, our marketing efforts will initially focus on utilizing existing gaming, convention and travel industry database contacts.  Additionally, we intend to create and maintain a marketing fund based on operating cash flow.  With this fund, AAEC will create its own tourism promotion department and preside over wide-reaching marketing campaigns that will generate tourists, conventioneers and gamblers to Macau.

<u>Temporary Facility</u>

AAEC plans to open a temporary facility as soon as possible, while the permanent facility is under construction.  This will provide an excellent training facility for our future staff, further reduce unemployment, and create additional revenue to Macau. This temporary facility will be of very high quality and may continue to operate after completion of the permanent facility.  Permission to develop additional gaming facilities may be requested as the market demands.

<u>Design</u>

AAEC has retained the Jerde Partnership International, Inc., one of the world's leading architectural firms.  Since 1977, the Jerde Partnership has developed some of the world's leading structures, including Las Vegas' own Bellagio Reports (cost: US$1.9 billion (15 billion patacas); opened: 1998), Fukuoka, Japan's Canal City Hakata (cost: US$1.4 billion (11,2 billion patacas); opened: 1996) and Minnesota's Mall of America (cost: US$625 million (5 billion patacas); opened: 1992), to name a few.

Initial conceptual design materials depicting preliminary designs of the proposed project are included in AAEC's Tender materials for your reference.  A diagram of the project master plan is attached to this summary.  [*Refer to attached diagram*]

4. <u>Beneficial Impact on Macau</u>

<u>Project Capital Commitment</u>

The total development cost of the Venetian (Macau) is estimated to be US$1 billion (8 billion patacas). The Project will be constructed in Phases. Phase I is estimated to be approximately US$500 million (4 billion patacas).

CDIB has issued to the Macau SAR Government a financing commitment in support of this tender for an amount of at least US$500 million (4 billion patacas) as shown in "Commitment Letter" dated December 3rd, 2001, attached with this submission.

<u>Introduction of International, Public, Regulated Sponsors</u>

The operation of casinos by US operators anywhere in the world must be conducted to meet the stringent regulatory standards of US gaming authorities. The Venetian in Las Vegas and its gaming operations are subject to extensive regulations by the Nevada Gaming Commission. The Venetian's securities are regulated by the U.S. Securities and Exchange Commission and its senior executives are individually licensed. As world-class gaming operators and to guard against any violation that may jeopardize the Venetian's gaming license, the company has adopted a series of internal controls or self-regulation, that ensure that all management and employees comply with certain policies and controls. **The policy of the Venetian is to conduct its business with honesty and integrity and in compliance with the highest legal and ethical standards. Management of the operations of the Venetian Casino (Macau) will be conducted to meet the high standards of the Venetian (Las Vegas).**

The operations of AAEC will also be required to meet the requirements of CDIB, a publicly traded, financial institution. CDIB is subject to regulatory oversight by the Taiwanese Central Bank, Ministry of Finance and Securities and Exchange Commission. CDIB's continued success in the Asian Region is highly dependent upon their application of the highest operating standards.

<u>Broadening the Business Model</u>

AAEC proposes to develop a very different business to the existing casino operations in Macau. The business model will resemble the Venetian Las Vegas where, unlike its competitors, 60% of the business profits are derived from convention, hotel, resort and entertainment activities and only 40% is derived from gaming. **This model will have the greatest positive impact on Macau's economy and create the greatest economic diversification and opportunity for growth.**

What will truly differentiate this Project, in both design and operation, will be its emphasis on the convention, conference and business traveler market. **This emphasis is critical to increasing mid-week occupancy for all Macau hotels and generally diversify and grow the Macau economy.**

CDIB's Related Investments in Macau

CDIB will support development in the following areas: banking, logistics, aviation and the development of a technology park.

At the first stage, projected investment for these additional projects totals US$780 million (6.24 billion patacas), will increase annual consumer spending by US$252 million (2.016 billion patacas), and will result in the creation of 6,330 new employees, representing an increase in employment in Macau of 3.1%. These initiatives will increase Macau's GDP by 16.24% and generate more than US$36 million (288 million patacas) annually in incremental government tax revenues.

Positive Impact on Macau Labor Force

Upon full implementation of this bid, over 13,000 jobs will be created. This employment increase will introduce leading casino systems management and operating skills as well as those relating to marketing, accounting and hospitality management.

CDIB's other investments will introduce further financial, technological, logistical, transport, aviation and tourism knowledge and skills. All of this skills transfer will be supported by ongoing training and development.

Economic Impact on Macau

As noted above, Gaming tax will generate significantly higher revenues to Macau than current gaming tax receipts.

Non-gaming profits, a significant component of our planned project, will generate incremental corporate tax for Macau.

In addition, the other CDIB investments will generate further corporate profits, subject to Macau profits tax.

Premiums and Contributions

In addition to the required fixed premium, AAEC is proposing a substantial variable premium for its proposed Taipa facility of sixty thousand patacas (ptcs 60,000) per gambling table and twelve thousand patacas (ptcs 12,000) per slot machine, plus a variable premium for its proposed temporary facility in Macau of eighty thousand patacas (ptcs 80,000) per gambling table and sixteen thousand patacas (ptcs 16,000) per slot machine, for a total variable premium of fifty-seven million patacas (ptcs 57,000,000) as described in detail in the attached materials. The total annual fixed and variable premium is estimated to be eighty-seven million patacas (ptcs 87,000,000).

Additionally, AAEC is proposing substantial contributions, totalling three percent (3%) of gaming revenue, as further detailed in the attached materials.

5.    **Shareholders**

The applicant, AAEC, is a registered Macau corporation, whose shareholders, as soon as practicable subsequent to receiving a gaming license, will be as follows:

| Shareholders Name | Percentage of Shareholding |
|---|---|
| The Venetian or an affiliate of Venetian | 27½% |
| CDIB | 20% |
| Executive Director | 10% |
| Others | 42½% |
| Total | 100% |

6.    **Management**

The Venetian will manage the Project with an experienced and highly successful management team that is well-known for its excellence and integrity in the industry. Additional information on this management team is included in AAEC's Tender materials.





0   40   80 m

**VENETIAN HOTEL CASINO**                    CASINO LEVEL

RETAIL DINING ENTERTAINMENT CONFERENCE AND EXHIBITION CENTER



LEGEND

PRIMARY DISTRIBUTOR

DISTRICT DISTRIBUTOR

FUTURE LIGHT RAIL

0    500    1000    2000 m

VENETIAN HOTEL CASINO    MAJOR VEHICULAR ACCESS DIAGRAM

RETAIL DINING ENTERTAINMENT CONFERENCE AND EXHIBITION CENTER

Asian American Entertainment Corporation, Limited

## SUBMISSION BY TENDERER

# CONTENTS

| Section | Description | Page |
|---|---|---|
| 1 | Introduction and Intention to Conclude a Contract | 1 |
| 2 | Our Vision for Macau | 3 |
| 3 | Building a Convention/Exhibit-Based Casino Resort and Temporary Casino Facility | 4 |
| 4 | Expanding the Facility | 6 |
| 5 | Summary of Phase I | 6 |
| 6 | Jerde Partnership International, Inc. - Architect | 7 |
| 7 | China Development Industrial Bank - Partner | 7 |
| 8 | Corporate Structure and Financial Commitment | 9 |
| 9 | The Venetian – Experienced Management | 12 |
| 10 | The Venetian Group - Operating Gaming Facilities in a Highly Regulated Environment | 15 |
| 11 | The Venetian Business Model | 15 |
| 12 | Recruiting and Training | 17 |
| 13 | Educational Outreach | 18 |
| 14 | Bringing Cultural Attractions - The Guggenheim and Hermitage Museums | 18 |
| 15 | Marketing Expertise | 20 |
| 16 | Premium and Contributions | 22 |

# ASIAN AMERICAN ENTERTAINMENT CORPORATION, LIMITED

## SUBMISSION BY TENDERER

### 1.   Introduction

Asian American Entertainment Corporation, Limited (AAEC – the applicant for the casino license which is the subject of this Tender Submission (Tender) and its partners are honored and privileged to submit this Tender to the Government of the Macau Special Administrative Region of the People's Republic of China (Macau). We see this as an opportunity to forge long-lasting success and economic diversification for both public and private entities and to create a spectacular tourism and business destination for the entire world to behold. In the pages that follow, you will meet the partners in our business consortium, including The Venetian Casino Resort, LLC (The Venetian), China Development Industrial Bank (CDIB), and an outstanding and diverse group of partners who share a collective desire to create a project which will significantly benefit all aspects of Macau's economy. We will also describe our vision for Macau's expanded tourist, gaming, and convention-based economy -- something that to date has been an underdeveloped opportunity.

As you will see from this summary and the various other documents we have included with our Tender:

A.   **We currently have all of the equity funds we require on-hand for this project,** and all such funds are provided by entities and individuals who are highly respected in their respective fields and of the highest integrity.

B.   **We bring unique economic diversification expertise and resources to Macau, which will broaden Macau's economic and visitor base,** reduce unemployment, and provide substantial and far-reaching benefits to Macau. This expertise will create a **new convention, tradeshow and meeting industry, new cultural and educational facilities, and extensive investment in Macau.**

C.   **We bring world-class gaming, hotel, retail, and tradeshow/convention expertise,** which will assure the project's success.

D.   **In addition to our proposed gaming-related project, we bring additional investments in Macau totalling over US$780 million/6,264,960,000 patacas in banking, airlines, logistics, and high-tech development, which will result in a 16.24% increase to Macau's GDP, the creation of over 6,000 new jobs, over US$250 million/2,008,000,000 patacas in new consumer spending and over US$36 million/289,152,000 patacas in additional non-gaming annual tax revenue to Macau.**

We hereby express our intention to conclude a concession contract which shall reflect the terms and conditions of this submission, or such other terms and conditions as may be negotiated in accordance with the applicable regulations.

We value your time and patience in reviewing this material, and hope you will obtain a greater understanding of who we are, what we stand for, and what we will do for Macau and its economy if our Tender is successful.

## 2.  Our Vision for Macau

As one of the world's leading destination resort, casino, hotel, shopping mall and convention facility operators, The Venetian has joined with a uniquely qualified team to develop, construct, finance, and operate what will one day be a destination of unsurpassed status anywhere in the world.  AAEC's vision for Macau is to combine world-class entertainment and hospitality, The Venetian's state-of-the-art, world-renowned expertise in the tradeshow, convention, and conference businesses and Macau's strategic location and exciting infrastructure to create the Las Vegas of Southeast Asia, in an environment which supports strict governmental casino regulation and private sector development.

With a large population base, diversifying and expanding economies, the relaxation of border restrictions, and the expansion of trade horizons in Southeast Asia, Macau has the potential to be a dynamic driver of the regional economy.  Residents of the region currently travel primarily to the United States, Europe, or other Southeast Asian tourist and gaming destinations for their business and leisure entertainment.  By developing a more comprehensive "Las Vegas Strip" type facility and combining it with CDIB's planned strategic investments in Macau and The Venetian's unmatched ability to create extraordinary tradeshow, conference, and convention venues, Macau can become the business travel and tourist destination of choice for the increasing number of affluent people living in Southeast Asia.

Our proposed site is centrally located on and that we envisage will become the future high-growth area of Macau.  We are considering a 160-acre plot of reclaimed land on the southeastern part of the Taipa Island.  Located just east of the Rotunda do Istmo, it is about 5 minutes from the airport and the proposed new ferry terminal.  It also is close to the Lotus Bridge that connects Macau with China.  Proximity to major transportation centers is particularly well-suited for our convention-driven business model.  It provides easy access for business people, gaming customers, tourists, and the equipment/hardware used for conventions and exhibitions.  The short ride to the airport will be particularly convenient to our international customers, a critical market segment that can make significant contributions to the Macau economy.

This site would accommodate a comprehensive casino and convention-based tourism development.  This land links China to Macau and Macau's airport and passenger port transportation infrastructure, and provides land parcels large enough for the Las Vegas-style tourist attractions and other developments we propose.  Non-casino attractions, such as exclusive retail shops, restaurants, spas, museums, and a massive trade and convention complex, would be directly linked to the casino resort attractions to offer the most comprehensive destination in Southeast Asia, rivaling that of Las Vegas.

By bridging China to the transportation amenities of Macau, the new development would provide convenient access for tourists, and act as a cluster of attractions to become a tourism magnet for Macau.

The Venetian in Las Vegas has gained international recognition for developing the ultimate entertainment and business campus by combining all-suite rooms, shopping, dining, health spa, live entertainment, and art galleries with comprehensive meeting, tradeshow, and exhibit facilities to create a compelling destination resort that includes casino gaming.  Attached for your reference is certain background material on The Venetian.  The Venetian is a living example of how casino gaming can be used to create a comprehensive international tourist

attraction. The Venetian and its partners propose to develop a similar mega-resort facility in Macau. In addition, The Venetian has had high-level meetings with the Beijing Government to help develop a plan to bring international exhibitions to Macau and Beijing through the current operation of its exhibition center in Las Vegas. A combination of northern and southern China exhibition halls with U.S. convention and exhibition management expertise would bring a new dimension to Macau tourism and economic development.

The project we foresee in Macau would be a master-planned convention center-casino-hotel built with almost 100,000 square meters of exhibit and convention space and over 3,000 all-suite rooms to be constructed in several phases commensurate with demand. Additionally, AAEC, The Venetian, and CDIB propose to further strengthen and diversify Macau's economic base by making other investments in education, training, infrastructure, high-tech business development, and financial institutions in Macau, which will bring additional economic development and employment opportunities to Macau and its residents.

In doing so, we intend to bring our unique convention-based casino destination resort development approach to Macau to combine with Macau's own special resources to revitalise Macau's tourist economy. To that end, The Venetian group's expertise in developing large projects has been recognized by the Urban Land Institute ("ULI") by receiving ULI's "Award of Excellence for Development of Large Scale Hotels for 2001" and the Nevada Governor's Conference on Travel and Tourism's "2001 Tourism Development Award". The result will be a sought after comprehensive destination within a destination that creates huge economic gains for Macau and its people. How do we know this?

We speak from experience. When the $1.5 billion US (12,047,999,382 patacas) Venetian Resort-Hotel-Casino opened in May 1999, we generated in excess of $177,000,000 US (4,421,663,927 patacas) annual tax revenues to Las Vegas and Nevada. Almost $70,000,000 US (562,239,971 patacas) of that tax revenue flowed directly to government. Additionally, the immediate impact of over $85,000,000 US (682,719,965 patacas) of taxes generated by The Venetian's construction activities helped to relieve many near-term taxpayer supported budgets, add to current bonding capacity, and substantially assist in supporting needed infrastructure improvement in Southern Nevada. Similarly, The Venetian created more that 10,000 jobs with tens of thousands of additional jobs created by the impact of the new resort-hotel-casino on Las Vegas' economy. We foresee a similar economic impact and diversification for Macau.

## 3. Building a Convention/Exhibit-Based Casino Resort and Temporary Casino Facility

It is anticipated that design, approval, and construction of a five-star Las Vegas-style hotel would be completed within three years. Given this time frame, we are also requesting permission to operate a temporary casino, dining, and entertainment facility while the permanent facility is under construction which could provide an excellent training facility for our future staff, further reduce unemployment in the area, and create additional revenue to Macau. We are in the process of identifying an appropriate currently vacant building in Macau which can be quickly retrofitted and developed as such a temporary facility, and which could be opened within one year of receiving the subject gaming concession. This temporary facility, although developed quickly, will be a major tourism attraction, focusing on upscale travelers and providing luxury amenities, and will likely continue to operate after completion of the permanent facility.

Phase 1 of the casino, conference, and entertainment facility will include the following:

**A.  Hotel Guest Suites**                                         40,000 M²

The hotel would initially feature approximately 500 luxurious suites with all-marble baths and foyer, crown molding, fine fabric, two phone lines, a computer modem line with high speed internet access, fully stocked mini-bar, and an in-room safe.

**B.  Conference Rooms/Exhibition Hall/Multi-Purpose Facility**                45,000 M²

A large exhibit, conference and multi-purpose complex will be built with the ability to be expanded as the convention and exhibition market for Macau is developed.   The primary advantage of The Venetian group (in addition to developing the largest resort in Las Vegas with over 800,000 square meters under one roof) is its experience in the conference/exhibition center business.   The owner of The Venetian, Sheldon G. Adelson, created and developed the world's largest trade show, the giant high-tech Comdex exhibition.   The Venetian operates the world's largest privately-owned conference/exhibition complex of 170,000 square meters in Las Vegas.   The combination of exhibition development and conference/exhibition management expertise with conference/exhibition centers in Macau, Beijing, and Las Vegas should rapidly develop a new tourism base for Macau that will further diversify its tourism economy.

**C.  Restaurants**                                              8,500 M²

Five to seven restaurants of Chinese and Western styles will be built near the casino halls, providing convenient service for tourists.

**D.  Shopping Center**                                         10,000 M²

Similar to The Venetian's Grand Canal Shoppes Shopping Center in Las Vegas (note: this is the **second most lucrative mall in the world** generating sales of nearly $1,000 US (8,032 patacas) per square foot of leased space), shops and stores will be arranged along a Venetian street-scene with stone walkways, canals, bridges, and The Venetian's famous singing gondoliers.

**E.  Live Entertainment Showroom**                              4,000 M²

A luxurious showroom with flexible stage, lighting and sound will be built to present varied entertainment shows from the elaborate stage shows of Las Vegas to the nightclubs of the Pearl River Delta.

**F.  Health Spa, Gymnasium**                                    2,000 M²

Featuring saunas, steam rooms, and health and beauty treatments.

**G.  Garden Pool and River Ride**                               15,000 M²

Tropical swimming lagoon, water gardens, waterfalls, circulating river attraction meandering through lush foliage of a tropical rain forest.

**H.  Art Museum**                                               1,000 M²

The Guggenheim Hermitage Museum located inside The Venetian in Las Vegas displays world-renowned art valued in the billions of U.S. dollars. The Venetian would propose to build a similar attraction for Macau through its affiliations with the Guggenheim in New York and The Hermitage in St. Petersburg and their affiliations with museums in Vienna and Shanghai. The Art Museum of Macau would display world-renowned collections of western and eastern art and artifacts bringing an additional element of culture and education to Macau's tourism appeal. This museum, like its sister facility in Las Vegas, will also have special art programs available for students in Macau schools.

I.  Entrance Feature                                                        4,000 M²

A large pool of water representing the sea approach to Venice greets the visitor upon arrival to The Venetian. Fountains, waterfalls, and a floating restaurant add activities and interest to the arrival experience to transport the visitor to The Venetian experience.

J.  Casino (two components)

(1)  Great Casino Hall                                                  10,000 M²

The Great Casino Hall with Las Vegas style is large, luxurious, and comfortable and has all kinds of gaming tables and slot machines. It is surrounded by restaurants, entertainment venues, and shopping experiences.

(2)  VIP Casino Halls                                                    5,000 M²

According to the rules of Macau Casino Gaming Committee, ten VIP Casino Halls will be developed and will be controlled by the casino operator.

K.  Back of House Support Facilities                           5,000 M²

L.  Parking (For 300 Cars)                                           9,600 M²

## 4.   Expanding The Facility

Additional phases of development would expand the exhibit center, add thousands of hotel rooms, restaurants, stores, and entertainment rooms, and make The Venetian a full Las Vegas entertainment destination in the heart of Macau.

Initial conceptual design materials depicting preliminary designs of the proposed project are included in AAEC's Tender materials for your reference.

## 5.   Summary of Phase I

Phase I development represents not only a $500,000,000 US (4,015,999,794 patacas) full-fledged convention-anchored destinations resort, but the beginning of a new Macau. The Venetian Resort will be master-planned to include a huge convention/exhibition hall, thousands of all-suite rooms, restaurants, retail stores, entertainment rooms, and museums representing a total investment of over $1 billion US (8,031,999,588 patacas).

_Phase I Development Cost_

| | |
|---|---|
| Total Construction Area | 124,000 M² |
| External Garden Area and Canal Entrance Feature | 4,000 M² |
| | |
| Total Cost | $450,000,000 U.S. / 3,614,399,815 patacas |
| Land Rent or Price | 50,000,000 U.S. / 401,599,979 patacas |
| | |
| Total Investment | $500,000,000 U.S. / 4,015,999,794 patacas |

## 6.   Jerde Partnership International, Inc. – Architect

To help facilitate this development, The Venetian has retained the Jerde Partnership International, Inc., one of the world's leading architectural firms, well-known for designs of large-scale retail and mixed use projects that successfully create a sense of place and identity for cities world wide.  Since 1977, the Jerde Partnership has developed some of the world's leading structures, including Las Vegas' own Bellagio Resort (cost: $1.9 billion US/15,260,799,217 patacas; opened: 1998), Fukuoka, Japan's Canal City Hakata (cost: $1.4 billion US/ 11,244,799,423 patacas; opened: 1996) and Minnesota's Mall of America (cost: $625 million US/5,019,999,742 patacas; opened: 1992), to name a few.

Projects of the Jerde Partnership have been recognized by the American Institute of Architects (AIA), the International Council of Shopping Centers (ICSC), and two ministries of the Japanese government, among many others.  With that in mind, AAEC finds the Jerde Partnership well-suited to make its vision for Macau a reality.   We have included additional background information on the Jerde Partnership for your reference.

## 7.   China Development Industrial Bank – Partner

One of AAEC's key partners is China Development Industrial Bank (CDIB), a world leader in the banking and finance industries.  Founded on May 14, 1959, CDIB went public on February 9, 1962, and has remained a publicly-traded, widely-held institution under its Chairman, Dr. Liu Tai Ying.

To date, CDIB is the biggest investment bank in Taiwan.  CDIB's main business activities are in investment.  Approximately 80% of CDIB's revenues come from disposal of investments and booked income from stock dividends and equity income.  For CDIB, capital for lending and investment comes mainly from inter-bank loans or financing from the Central Bank of China and certain funds.  CDIB has NT$65,372,760,000 (15,215,125,527 patacas) in paid-in capital, with net value at NT$17.19 (4.00 patacas) per share.

In its early years in the 1960s and 1970s, CDIB responded to the government's calls to focus on textile, man-made fiber, and petrochemical industries by actively investing in and lending to those industries.  CDIB's participation contributed to textile and man-made fiber industries becoming leading domestic industries in the 1960s and petrochemical industries dominating GDP in the 1970s in Taiwan.

CDIB has also expanded significantly over the past 40 years.  In the 1980s, CDIB thrust itself into the electronics and telecommunication industries; and in 1984 it began developing its investment banking business, rendering advisory services on large-scale projects, corporate finance, securities underwriting, and real estate development.  CDIB also became a forerunner

and leader in venture investments and mutual funds in Taiwan by launching Sino-Scan Venture Fund, Ltd., China Venture Management Inc., and China Securities Investment Trust Corporation. Furthermore, to better serve its clients offshore, in 1987 it started to carry out an overseas expansion plan. All such strategic endeavors began to bear fruits in the 1990s. CDIB's total assets have grown sharply from NT$2.5 billion (581,680,319 patacas) in 1971 to NT$181 billion (42,126,686,007 patacas) in 2000, which serves as a solid foundation for its rapid growth in recent years. Euromoney even selected CDIB as 1993's Best Investment Bank in Taiwan.

CDIB viewed the 1990s to be an era of innovation on all fronts for its services. CDIB is actively forming its own Asia Pacific financial service network so as to successfully play the role of an important regional gateway to bridge capital flow to business opportunities in the region.

*Common Wealth*, Taiwan's leading magazine, recently published a survey of Taiwan's 2,000 enterprises. With an outstanding return on revenue of 58.5% as of May, 1999, CDIB ranks No. 4 among all companies, or No. 1 among all banks, in terms of profitability of businesses in Taiwan.

CDIB reported a net income of NT$14,794 million (3,443,216,712 patacas) for Fiscal Year 2000, and its net income has grown by more than 30% for the fourth consecutive year. Since its conversion into an industrial bank on January 1999, CDIB has entered into its second expansion stage. Each department has been actively promoting domestic and overseas business to provide customers with a full line of financial services. With an aim at expanding its global business, CDIB has teamed up with major domestic and overseas enterprises to form strategic alliances and establish its global financial and investment network. Currently, CDIB has set up its presence in the U.S., Israel, U.K., Japan, Korea, Australia, Thailand, the Philippines, etc. In addition, CDIB plans to set up its International Banking Department to broaden the range of services.

**Since its founding, CDIB has been a strong supporter of economic development in a variety of areas. As a part of this Tender, CDIB has committed not only to provide the all of the equity required for this project, but to make direct investments worth hundreds of millions of U.S. dollars in Macau in a variety of businesses, including:**

- the creation of a Macau-based airline company which can serve as a gateway to Southern China;

- the creation of a major Logistics Center in Macau to facilitate business in and to the region;

- the creation of a new Macau bank that can develop international and investment banking businesses in Macau; and

- the creation of virtual banking and related financial products in Macau to form a clearance center for financial and non-financial transactions in the Pan-China business circle.

Set forth below is a summary of these additional investments and their projected benefits, all of which are described in greater detail in the enclosed materials:

| Main Economic Indicator / Investment Item | GDP Growth | Employment | Investment (ptcs-mill) | Annual Consumer Spending (ptcs-mill) | Annual Gov. Tax Revenue (ptcs-mill) |
|---|---|---|---|---|---|
| Project 1:  Virtual Bank | 1.63% | 260 | 776 | 45 | 12.2 |
| Project 2:  Logistic Center | 1.07% | 1,500 | 106.4 | 368 | 73.6 |
| Project 3:  Intelligent   Industrial Park | 3.98% | 3,800 | 1,040 | 1,280 | 24 |
| Project 4:  Bank | 8.0% | 270 | 3,840 | 80 | 102.6 |
| Project 5:  Airline Company | 1.56% | 500 | 480 | 240 | 80 |
| Total Benefit | 16.24% | 6,330 | 6,242.4 | 2,013 | 292.4 |

This alone will have a massive impact on Macau's economy, employment situation, and economic diversification efforts.  With that in mind, CDIB along with its partners in AAEC, make a formidable financial partnership as they bring a huge amount of currently available institutional equity funds directly into Macau's economy.

8.   **Corporate Structure and Financial Commitment**

The purpose of this section is to summarize the corporate structure upon which The Venetian, CDIB and their partners will, directly or indirectly through affiliates work together with AAEC to develop the project in Macau on land to be acquired by AAEC.

A.  Shareholding Structure

It is proposed that AAEC's shareholders shall be as follows:

| Name | Ownership Percentage |
|---|---|
| The Venetian or a wholly-owned affiliate of The Venetian | 27½% |
| CDIB | 20% |
| Executive Director | 10% |
| All others (as noted in the enclosed materials) | 42½ % |
| | 100% |

To the extent that these shareholdings have not been formally established at the date of submitting this Tender, they will be established as soon as practicable hereafter.

AAEC's Board of Directors consists of seven directors.  The officers of AAEC will be elected by AAEC's Board of Directors.  AAEC's sole business will be to own the project and any expansions thereof or additions thereto and any business or facilities related or ancillary to the project.   To the extent that this requires AAEC to incorporate subsidiaries in Macau, this will be done.  **CDIB has committed to provide all of the equity and any other funds necessary to build the project.**   A copy of this commitment signed by CDIB's Chairman and CEO is included with these Tender materials.  Also, CDIB will invest hundreds of millions of dollars in other businesses in Macau, as discussed above, to further significantly diversify and develop Macau's economy.

The Venetian is the owner and operator of the largest casino, hotel, shopping, conference, and tradeshow facility in the world, and is an experienced operator of casinos in a highly regulated environment. As described in more detail below, The Venetian will be the exclusive manager of the project.

B.   Development Agreement

The Venetian will form a wholly-owned subsidiary which will enter into a Development Agreement with AAEC. This subsidiary will be formed and will elect officers and directors upon AAEC being granted a gaming concession in Macau. References in this document to The Venetian include this new subsidiary. This subsidiary and its directors and officers (all of whom will be appointed by The Venetian) will submit all disclosure forms, rating agency reports, and other information required by the Macau authorities promptly after it is formed. The Development Agreement will set forth the method of selecting the design professionals, including, but not limited to, the architect, interior designer, and general contractor. In addition to the Jerde Partnership described above, it is anticipated that local architects, engineers, and consultants will be engaged to assure that the design confirms with local codes and rules. The design of the project will be based upon The Venetian's experience and expertise with input from market research studies and the knowledge of local investors. The Venetian will work with the selected design professionals to accomplish the project design. The Venetian's gaming, legal, accounting, and consulting personnel, as well as legal, technical, and accounting consultants in the United States and Macau, will coordinate their activities with the activities of AAEC in accomplishing the design, development and construction of the project. AAEC will reimburse all expenses of The Venetian incurred in connection with its provision of these services, including, but not limited to, allocable overheads and salaries of certain Venetian personnel, travel, out-of-pocket, consultant, and designer expenses. Any final plans will be subject to joint approval. The development agreement will provide for the payment by AAEC of a development consulting fee to The Venetian equal to a percentage of total project costs, which fee will be in addition to the reimbursement of expenses noted above. The total project costs will include the costs of the temporary casino. This development consulting fee will be paid to The Venetian upon the substantial completion of the first phase of the project.

C.   Management Agreement

In addition to the Development Agreement referred to above, the wholly-owned Venetian subsidiary will enter into an exclusive management agreement with AAEC to manage the project on the following terms:

(1)   The management agreement will remain in force for the duration of the gaming license (including all renewals);

(2)   The Venetian will have the exclusive right to manage the business and operations of AAEC, including the provision of gaming, legal, administration, pricing, accounting, licensing, contract negotiation, maintenance, entertainment, inventory purchasing, merchandising, marketing and other services and shall be authorized to take such actions as it deems necessary or appropriate to carry out its duties.

(3)    Upon receipt of an appropriate gaming license or selection by the Macau Gaming Committee as a preferred developer, The Venetian will recruit and train all necessary management and other personnel to operate the proposed casino and related facilities.

(4)    AAEC shall be entitled to periodically audit the books and records of The Venetian.

(5)    AAEC will reimburse The Venetian's costs and expenses (including, but not limited to, allocable overheads and salaries of certain Venetian personnel, travel, out-of-pocket and consultants' expenses) and, in addition, will pay to The Venetian a management fee equal to:

(i)    two percent (2%) of the project's gross revenue for each fiscal year; plus

(ii)    ten percent (10%) of the project's EBITDA for each fiscal year.

**D.   Licensing Agreement**

The Venetian will enter into a licensing agreement with AAEC to provide the project with use of certain proprietary names and materials of The Venetian, including use of the name "Venetian" in connection with the operation and marketing of the project. The licensing agreement shall provide for the payment of a licensing fee to The Venetian equal to 1-1/2% of the project's total gross revenue.

The basic terms and conditions summarized above will be included in definitive development, management, licensing and related agreements (collectively, the "Definitive Agreements") to be entered into between the respective parties and AAEC. The Definitive Agreements shall include such representations, warranties and indemnities as are customary in such transactions. The Definitive Agreements, will contain a dispute resolution mechanism which shall require that any dispute which cannot be resolved in the ordinary course of business: (i) shall be submitted to Messrs. Hao and Weidner, as representatives of AAEC and The Venetian respectively for mediation, and if not then resolved, (ii) shall be submitted to binding arbitration with an independent arbitrator chosen by the parties with expertise in the field of knowledge applicable to the dispute. It is the intention of the parties to execute the Definitive Agreements as soon as practicable.

As noted above and as set forth in the enclosed Commitment of CDIB, CDIB has committed to fund all project costs.

Additionally, the owner of The Venetian is Sheldon G. Adelson, one of the wealthiest men in the United States. In developing The Venetian in Las Vegas, Mr. Adelson provided more that $320 million US (2,570,239,868 patacas) of his money to begin the project. He possessed the where-with-all to infuse the project with an initial $95.3 million US (765,449,560 patacas) to partially fund construction costs and expense, an additional $225 million US (1,807,199,907 patacas) in real estate; and over $80 million US (642,559,967 patacas) in other support.

<u>**IT IS IMPORTANT TO NOTE THAT ALL MONEY PROVIDED IN CONNECTION WITH THIS TENDER IS UNQUESTIONABLY ON-HAND, READILY AVAILABLE, AND THE PROVIDER(S) ARE OF THE HIGHEST LEVEL OF HONESTY AND INTEGRITY.**</u>

### 9. The Venetian Group - Experienced Management

The Venetian group's top management comprises the following executives. Please note that they are highly experienced executives who have been licensed for many years in a variety of major gaming jurisdictions and thoroughly scrutinized and approved by the Nevada Gaming Control Board and other regulatory agencies.

SHELDON G. ADELSON
CHAIRMAN OF THE BOARD

As Chairman of Las Vegas Sands, Inc. (LVSI), developer of the $1.5 billion US (12,047,999,382 patacas) Venetian Resort-Hotel-Casino, a 3,036 suite luxury resort, hotel, retail, casino and convention complex, *Mr. Sheldon G. Adelson* is a "Forbes 400" member and Las Vegas resident. He is the sole creator of COMDEX, the world's largest trade show. Known worldwide for his business acumen and visionary leadership, he is also the Chairman of G.W.V., a Needham, Massachusetts-based travel company and one of the largest regional travel wholesalers in the United States.

Mr. Adelson's numerous privately-held corporations range from technological enterprises to leisure resorts. Among them, the Sands Expo and Convention Center, the only privately-financed, developed, and operated convention center in the United States. In April of 1995, as Chairman of the Board and C.E.O. of The Interface Group, Mr. Adelson and his partners pioneered the largest transaction in the history of the worldwide trade show industry by selling Interface's trade show division, including COMDEX, to a Japanese corporation for nearly $900 million US.

COMDEX, under Mr. Adelson's creation and development, grew into what is now considered "the" premiere event for the worldwide computer and communications industry. Since the sale of his trade show division, Mr. Adelson assumed sole ownership of LVSI and is currently overseeing The Venetian Resort-Hotel-Casino.

WILLIAM P. WEIDNER
PRESIDENT AND CHIEF OPERATING OFFICER

*Mr. William P. Weidner* has served as President and C.O.O. of LVSI since December of 1995. A veteran hospitality industry executive, Mr. Weidner's responsibilities include directing all development activities of LVSI, including the planning, financing, construction, and implementation stages, and the creation, review and oversight of all programs, systems, departments, and functions related to the management and administration of LVSI.

Mr. Weidner is an M.B.A. graduate of Michigan State University. After serving as Assistant Professor of Business Administration and Hotel Management at Smith College for 2-1/2 years, he spent eight years with the Marriott Hotel Group, receiving its prestigious "Man of the Year" award in 1975.

In 1978, Mr. Weidner joined Caesars in Atlantic City as Vice President of Hotel Operations, and was named Vice President of Marketing a year later. Recruited by the Pratt Organization in

1981, he went on to serve as Executive Vice President of the Greate Bay Casino Corporation, owner of the Sands Hotel and Casino in Atlantic City.  In 1983, he was elected President of Greate Bay, and in 1985, President of the Pratt Hotel Corporation, Greate Bay's publicly traded corporate parent.  He also served as President of Pratt's Hollywood Casino-Aurora subsidiary and sat on the Board of Directors of Pratt Hotel Corporation and Hollywood Casino Corporation.

**BRADLEY H. STONE**
EXECUTIVE VICE PRESIDENT

As Executive Vice President of LVSI, *Mr. Bradley H. Stone* oversees the operations of The Venetian, as well as the development and construction for LVSI and all its subsidiaries.  Mr. Stone is an experienced hospitality industry executive and a graduate of the prestigious Hotel School at Cornell University.

Beginning his career as a trainee at New York City's famed Plaza Hotel, Mr. Stone went on to management positions at Marriott's Essex House in New York and at Caesars in Atlantic City, where he served as General Manager.

Joining the Sands Hotel in Atlantic City as Director of Operations, Mr. Stone earned a series of promotions, first to Vice President of Hotel and Casino Operations, then to Executive Vice President, and finally to President and C.O.O., as well as Executive Vice President of the parent Pratt Hotel Corporation.   Before joining LVSI, Mr. Stone was Chairman of the Casino Association of New Jersey.

**ROBERT G. GOLDSTEIN**
PRESIDENT
THE VENETIAN

As Senior Vice President of LVSI and President of The Venetian, *Mr. Robert G. Goldstein* is an experienced hotel casino executive with expertise in marketing and operations.

Mr. Goldstein is a graduate of the University of Pittsburgh and holds a law degree from Temple University.  In 1981, Mr. Goldstein joined the Sands in Atlantic City as Director of Casino Marketing, earning a series of promotions and ultimately becoming Vice President of Marketing and Executive Vice President.  He also served as Executive Vice President of Pratt Hotel Corporation.

**DAVID FRIEDMAN**
ASSISTANT TO THE CHAIRMAN OF THE BOARD/COUNSEL/SECRETARY

As Assistant to the Chairman, *Mr. David Friedman* brings to LVSI and The Venetian, an extensive legal background.  Mr. Friedman has extensive experience in developing, financing and operating gaming, hospitality and related projects.  Mr. Friedman is a magna cum laude graduate of the University of Pennsylvania with a law degree from the Georgetown University Law Center.

After graduating law school, Mr. Friedman joined the corporate law department of a large law firm.  He left private practice in 1983 to join the legal department of Bally's Park Place in Atlantic City, New Jersey.  In 1988, Mr. Friedman left Bally's to become counsel to the Atlantic City law firm of Horn, Goldberg, Gorny and Daniels, which was retained by Merv Griffin to assist in the acquisition of Resorts International.  After completing the acquisition, Mr. Friedman became Vice President and General Counsel to Resorts through 1993.  Subsequently, he became

Senior Vice President of Development and Legal Affairs for President Casinos, Inc., where he served until 1995, at which time he joined the Interface Group and LVSI in his present capacity, providing legal and other assistance to Mr. Adelson in his various business activities.
Mr. Friedman also serves as the Chairman of The Venetian's Compliance Committee. Additionally, Mr. Friedman has advised numerous governments on the establishment and regulation of gaming enterprises and drafted regulations and internal controls for the Gaming Industry which continue to serve as industry standards today.   He also has extensive experience in training casino personnel, including his experience as the President of the largest gaming school on the East Coast of the United States.

**HARRY D. MILTENBERGER**
VICE PRESIDENT OF FINANCE

*Mr. Harry D. Miltenberger* began his career in public accounting and served a variety of publicly-and privately-held gaming companies, including The Golden Nugget, Primadonna, Boomtown, and the El Dorado.

In 1984, Mr. Miltenberger joined Golden Nugget, Inc.'s Las Vegas operating subsidiary, GNLV Corp., as Principal Financial Officer and Treasurer.  His responsibilities included SEC reporting, financial reporting, forecasting, and budgeting.   In 1987, Mr. Miltenberger became Chief Financial Officer and Treasurer of the Naiman Company, a San Diego-based nationwide developer of mixed-use office complexes and hotels.

In 1997, Mr. Miltenberger became Vice President of Finance for Las Vegas Sands, Inc., the developer of The Venetian Casino Resort.  His responsibilities include financial reporting and accounting activity for the company, as well as its subsidiaries.  Mr. Miltenberger is a California Certified Public Accountant.

Set forth below is a Corporate Organization Chart, which summarizes the above relationships:



Las Vegas Sands, Inc.

### 10. The Venetian Group-Operating Gaming Facilities in a Highly Regulated Environment

The Venetian in Las Vegas and its gaming operations are subject to extensive regulation by the Nevada Gaming Commission, the Nevada State Gaming Control Board and Clark County. The Venetian's securities are regulated by the United States Securities and Exchange Commission. Taken together, these regulators have broad authority with respect to licensing and registration of entities and individuals involved in gaming and disclosure of financial information. During operation, The Venetian Las Vegas may be required to disclose the identities of the holders of its securities to the Nevada Gaming Authorities upon request. The Nevada Commission may, in its discretion, require the holders of any securities of The Venetian to file an application, be investigated and be found suitable to hold these securities.

To guard against any violation that may jeopardise its gaming license, The Venetian has adopted a series of internal controls, or self-regulation, that ensure that all management and employees comply with certain stringent policies and controls. Stated simply, the policy of The Venetian is to conduct its business with honesty and integrity, and in accordance with proper legal and ethical standards. The Venetian has produced a Compliance Policy which is administered by a Compliance Committee, and which sets forth responsibilities of all Venetian executives and employees. A copy of this Compliance Policy is attached for your information. A similar policy tailored to Macau operations will be implemented by AAEC.

### 11. The Venetian Business Model

The Venetian assures high occupancy and higher average daily room rates year-round with the 1.7 million square foot combined Sands Expo and Congress Center – **making The Venetian campus the largest combined meeting, conference and hotel facility in the world.** In that respect, The Venetian is different from all other Las Vegas mega-resorts in that its own meeting facilities enable it to displace weaker mid-week tour and travel customers with higher-value convention and trade show attendees.

The Venetian's luxury, all-suite rooms cater to a higher-budget customer mix composed of premium casino players and higher-end business and free and independent travelers. On the highest occupancy weekends, players will be assured a suite at The Venetian when they may not receive one at other Strip resorts that have limited suite inventory. Additionally, the Sands Expo and Convention Center continues to bolster mid-week occupancy throughout Las Vegas, as it has since it opened in 1990. **AAEC will bring a very similar business model to Macau to assure maximum diversification of the economy, job creation, and positive economic impact.**

In addition to the seven high-quality restaurants in the mall, the casino floor features six high-end brand-name restaurants including Zagat's #1 restaurants: from San Francisco, Postrio; from Los Angeles, Pinot and Valentino; from New York, Lutece; and from New Orleans, Emeril Lagasse's new Delmonico Steak House. This name-brand "restaurant row" concept draws upscale visitors and gaming "high rollers."

The Venetian has dispelled yesterday's assumptions and created a new Las Vegas that attracts millions of new visitors who might normally head for other resort destination cities, such as Palm Springs, San Francisco or Scottsdale.

Unlike other hotel operators in Las Vegas, The Venetian derives 60% of its profit from hotel, resort and conference operations, while just 40% stems from gaming. By contrast, other so-called Las Vegas "strip" hotels generally rely on their casinos for over 50% of their profits.

And, the awards keep coming in...

### Awards Bestowed Upon The Venetian

| | |
|---|---|
| Top 100 Hotels in the Continental US & Canada | *Travel & Leisure Magazine* |
| Ultimate 10 Hotels in the World | The Learning Channel |
| Grandest Hotels in the World (out of 10 hotels) | *London Sunday Mail* |
| Best Business Hotels (out of 7 hotels) | *American Way Magazine (American Airlines)* |
| Largest Standard Hotel Room in the World | *Guinness Book of World Records* |
| Best of the West (out of 50 hotels) | *Meetings Magazine* |
| Image of the Year Award (for six uniforms) | Nat'l Assoc. of Uniform Manufacturers & Distributors |
| 2000 Gold Key Award | *Meetings & Conventions Magazine* |
| 1999 Planners' Choice Award | *Meeting News* |
| Best Architecture | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Hotel Lobby | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Amusement Attraction—Gondola Rides | *Las Vegas Review-Journal--Best of 2000 Awards* |
| | |
| Best Place to People Watch—Grand Canal Shoppes | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Hotel Shop—Celebration of Golf | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Individual Store—Ripa di Monti | *Las Vegas Review-Journal--Best of 2000 Awards* |
| | |
| Best Asian Restaurant—Royal Star | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Italian Restaurant—Zefferino | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best of Award of Excellence—Valentino | *Wine Spectator Magazine* |
| Award of Excellence—Delmonico | *Wine Spectator Magazine* |
| Best Chinese--Royal Star | *Las Vegas Life--Epicurean 2000 Awards* |
| Best Steakhouse—Delmonico | *Las Vegas Life--Epicurean 2000 Awards* |
| Best Desserts—Postrio | *Las Vegas Life--Epicurean 2000 Awards* |
| | |
| Top 10 Resort Spas in North America—Canyon Ranch | *Conde Nast Traveler Magazine* |
| Seven Best Fitness Day Spas—Canyon Ranch | *Shape Magazine* |

## 12. Recruiting and Training

The Venetian in Las Vegas is generally regarded as one of the best employers, if not the best employer, in Las Vegas. There are a variety of reasons for this.

The Venetian has created unique benefit plans for its staff (which it refers to as "team members") that are designed to help team members better balance their personal and professional lives, so when they are at work they are in the best possible frame of mind to serve the guest. The Venetian offers a Team Member Concierge, which provides a number of services that save people time they would have to spend running errands. The Team Member Concierge provides free copying, faxing and delivery of prescriptions and sells bus passes, stamps, greeting cards, notary public services, dry cleaning and car washing. Another popular service is having a representative of our benefits administration company on-site. If a team member has a question about a benefits claim, he or she can meet with a representative (who has on-line access to the claims system) and get the situation resolved quickly.

The Venetian was the first Las Vegas casino to offer on-site childcare. This benefit is greatly appreciated by team members who can stop in and see their children on their breaks. Childcare concerns can weigh on team members' minds and affect the level of service they provide. Knowing their child is receiving excellent care in the very same building removes this concern so team members can focus their attention on our guests' needs. The Venetian offers a free wellness center that is open 24 hours, 7 days a week to make it convenient for people to work out and stay healthy. As part of the wellness program The Venetian also offers subsidized Weight Watchers classes.

The Venetian supports team members who are experiencing serious personal challenges. It provides an Employee Assistance Program that goes beyond the norm. The program offers free counseling visits. It also provides referrals to experts for people who are having stressful situations involving legal, financial, or family issues.

Another unusual benefit is having a Community Services Representative within the Human Resources Department. This person is an expert on services available through various community agencies and programs. When team members are facing a personal problem, they can obtain confidential assistance in finding resources to help them.

People tend to be more committed to an organization when they are involved and they feel their concerns are listened to and their ideas are valued. The Venetian uses a variety of methods to get team members involved in making The Venetian a great place to stay and to work.

The Venetian's President conducts "Coffees with the President" in which he meets for about an hour with ten to 15 team members from various departments two or three times a week. He also meets with managers for "Lunches with the President" twice each month.

The Human Resources Department conducts regular meetings with groups of team members and managers to get feedback on how things are going and suggestions for improvement. Issues are then discussed and, when possible, resolved at monthly "Work Environment Improvement Meetings," which involve the key operational Vice Presidents and Directors. The Venetian communicates responses to all the issues raised so team members know that their concerns can be effectively addressed.

The Venetian has a positive discipline process that focuses on building team member commitment to change, and which includes a Peer Review system that involves team members in reviewing any terminations or suspensions for fairness.

Included with this Tender submission is additional information regarding certain community outreach and training programs at The Venetian, which have helped to make The Venetian the most admired and respected employer in Las Vegas by Las Vegas' workforce. Similar programs, tailored to Macau operational requirements, would be instituted by AAEC. Also included is a preliminary management organization chart and staffing plan for the project.

## 13. Educational Outreach

With expertise provided by The Venetian and guided by David Friedman, who at one point during his career was the president of the largest casino school on the East Coast, The Venetian will work with all schools in Macau, such as the University of Macau, Macau Polytechnic Institute, the Institute For Tourism Studies, Inter-University Institute of Macau, Asia International Open University (Macau), The Institute of European Studies of Macau, United Nations University – International Institute for Software Technology, Macau University of Science and Technology, and Macau Institute of Management in developing a variety of educational outreach programs. The Venetian will become a corporate partner with these institutions to ensure the resources of the project will be accessible to Macau residents and workers.

## 14. Bringing Cultural Attractions – The Guggenheim and Hermitage Museums

In October, The Solomon R. Guggenheim Foundation opened two museums in Las Vegas at The Venetian: the **Hermitage Guggenheim Museum**, a 7,660-square-foot museum for the presentation of the collections from the Solomon R. Guggenheim Foundation, New York and The State Hermitage Museum in St. Petersburg, Russia; and the **Guggenheim Las Vegas**, a 63,700-square-foot facility for the presentation of special large-scale exhibitions. The two new buildings have been designed by Rem Koolhaas, a Dutch architect and winner of the prestigious 2000 Pritzker Prize.

The Guggenheim Hermitage Museum has been made possible through an alliance with The Venetian. "The new Guggenheim Hermitage Museum and Guggenheim Las Vegas at The Venetian will be the cornerstone of the continuing cultural renaissance of Las Vegas," said Sheldon Adelson, Chairman of The Venetian. "The Guggenheim is not the first cultural institution to have a presence in Las Vegas, nor is it the first occasion for world-class art to be seen in this city. However, the components involved—the Solomon R. Guggenheim Foundation, the State Hermitage Museum, Rem Koolhaas, and Frank Gehry, joining forces with The Venetian—make it by far the most compelling program to date."

The Guggenheim Hermitage Museum is located at the front of The Venetian, adjacent to the main entrance lobby. The opening exhibition features important works from the collections of The State Hermitage Museum in St. Petersburg and the Solomon R. Guggenheim Foundation. Subsequent exhibitions will be developed by the directors and curatorial staffs of the Guggenheim and Hermitage and will change approximately twice a year. The Guggenheim Hermitage Museum is operated by the Solomon R. Guggenheim Foundation.

The inaugural exhibition at **The Guggenheim Hermitage Museum** presents a selection of 45 masterpieces that highlight the distinct but highly complementary strengths of these two world-renowned collections. _Masterpieces and Master Collectors: Impressionist and Early Modern Paintings from the Hermitage and Guggenheim Museums_ features key examples of Impressionism, Post-Impressionism, and early Modernism, including exceptional paintings valued at over $2 billion US (16,063,999,176 patacas) by Cézanne, Chagall, Kandinsky, Matisse, Monet, Picasso, Renoir, and van Gogh.

**The Guggenheim Las Vegas** was conceived for the presentation of special exhibitions, ranging from contemporary painting and sculpture, to architecture and design, and multi-media art. "The exhibition spaces at the Guggenheim Las Vegas were inspired—in part—by the large gallery at the Guggenheim Museum Bilbao," said Mr. Thomas Krens, the Director of the Guggenheim. "In 1999, we presented nine steel sculptures by Richard Serra in that space, each piece weighing approximately 150 tons. It was one of the most beautiful exhibitions I have ever experienced; the equation between objects and the Frank Gehry space was sublime. From that point on, it was absolutely clear. The challenge for the Guggenheim Las Vegas was to expand upon the Bilbao space in every way possible, with an emphasis on difference, context, flexibility, and practicality. I believe that we have designed a space in Las Vegas that is absolutely unique. Rem Koolhaas brings an industrial aesthetic, an impeccable precision, and a powerful sense of space and humor to all aspects of the design."

The main gallery in the 63,700-square-foot building is approximately 210-feet-long, 160-feet-wide, and 70-feet-high. The largest gallery features a 70-foot by 70-foot pivoting door, as well as a functioning industrial bridge crane—hovering close to the ceiling and suspended from tracks at either side of the space—with a lifting capacity of 35 tons. The main floor of the large gallery is breached by a 210-foot by 30-foot trench, which can either be covered with 21 five-ton trench covers to create a single level, or the trench covers can be selectively removed to reveal the galleries on the lower level. The lower level is accessed either by escalators or via a lime green processional staircase 30-feet-wide. A skylight in the ceiling—12-feet by 70-feet—features motorized trap covers, located on the roof, which can either filter out all natural light or be fully open to the sky. A media wall that is 60-feet-high and 120-feet-wide comprises the northern wall of the main gallery.

The inaugural exhibition of the Guggenheim Las Vegas is _The Art of the Motorcycle_, first presented at the Solomon R. Guggenheim Museum in 1998 and one of the most successful art exhibitions in history. With more than 130 motorcycles on display, the exhibition chronicles the most compelling moments in motorcycle design and technology—from its humble beginnings as a steam-powered vehicle to the sophisticated state of motorcycle production today. The exhibition both explores and celebrates the motorcycle as a quintessential symbol of the Modern age.

Included in our Tender materials is an additional information package regarding the Guggenheim museums. This is an example of the type of cultural program The Venetian has developed in Las Vegas. It is anticipated that similar cultural attractions and facilities would be developed by AAEC in Macau that would be accessible to Macau residents and students.

## 15. Marketing Expertise

Brand Identification

In only two and one-half years of operation, The Venetian Hotel and Casino has become recognized worldwide as a leading convention and casino destination resort taking its place as one of the major brand names on the Las Vegas strip.

The Venetian has appeared on every network and cable television broadcast in the United States as well as major networks in Europe, Asia and South America. Non U.S. television exposure includes China T.V., Taiwan T.V., FTV, CTS, CTN, KNUV and many others. Articles on The Venetian have appeared in every major magazine and daily newspaper including Time, Newsweek, Forbes, Business Week to USA Today, Wall Street Journal, New York Times, Los Angeles Times, CDN Magazine and The Great Daily News. As an example, more than 1,000 stories, television segments, and radio broadcasts were generated from the opening of The Venetian alone, resulting in nearly 200 million media impressions world-wide. More recently, the opening of two Guggenheim museums at The Venetian resulted in over 300 media attendees from the United States, Europe, Asia, and South America. The result: major network and cable television exposure and front page print reviews culminating in thousands of stories equaling millions of dollars of publicity exposure. It's worthwhile to note that The Venetian has been featured on unprecedented six one-hour documentaries: "The Secrets of Venice in Vegas" (Travel Channel); "On the Inside: The World's Largest Hotel" (Discovery Channel); "King of the Strip" (The Learning Channel); "High Rollers" (E-Entertainment); "Modern Marvels – The Venetian" (The History Channel); and "Future Makers" (Discovery Channel). These one-hour specials are a part of cable programming that rotates as many as 15 times per year resulting in additional millions of exposures for The Venetian Brand. Since opening in 1999, The Venetian has been recognized as one of the "10 Ultimate Hotels in the world" (The Learning Channel); "One of the Ten Grandest Hotels in the World" (London Sunday Mail); "One of the Top 100 Hotels in the World" (Travel and Leisure Magazine); "One of the Seven Best Business Hotels" (American Way Magazine); "One of the World's Best Places to Stay in the World" (2001 Gold List – Conde Nast Traveler), and the list goes on.

Marketing Activities: Since its opening, The Venetian has spent over $40 million U.S. in direct advertising in American and international markets in major newspapers, magazines, billboards and in television advertising. The Venetian sent over 1,176,000 pieces of direct mail to date in the year 2001 alone. In its casino database of over 700,000 players, Asian players represented over 20% of the casino table games volume. Almost 250,000 e-mail promotional communications have been sent since September 11th to re-energize demand efforts after that tragic event. The Venetian's web site averages over 18 million visits per month, over 15% of these visitors are from outside the U.S.

Casino Marketing

The Venetian employs more than 38 casino sales representatives. Each executive spends 4-6 hours per day telemarketing to targeted casino players. Player packages, entertainment offers and special events (boxing matches, Hollywood star gatherings, famous athletes' events, etc.) are used as promotional vehicles to invite casino guests to visit The Venetian.

Asian Marketing Initiatives

The Venetian Asian Marketing Department has 16 full time employees. The Asian Player Services Marketing Department provides comprehensive coverage of the casino floor, assists Asian guests with any service issues. The staff has multiple language capabilities, including Japanese, Korean, Mandarin and Cantonese. A multi-lingual Butler team provides assistance to all premium casino players. The Department also has extensive associations with

independent agents, who represent domestic and international players from all over Southeast Asia. A retail shopping discount program with the Japanese Travel Bureau (JTB) in Grand Canal Shoppes augment these efforts.

Asian Offices/Reps, Cities/Activities
Current office locations are in Hong Kong and Taiwan, as well as Vancouver, British Columbia and Monterey Park, California. Offices coordinate sales activities under direction of the Marketing Office located in Las Vegas. Each Branch Office is staffed with an executive, a marketing representative and an administrative assistant. There are also 13 commissioned representatives throughout Southeast Asia, who coordinate player trips and in-market parties.

Venetian Executives from Las Vegas make several sales trips to Southeast Asia annually with high-level executive personnel and casino sales personnel to promote The Venetian throughout the region.

Asian Special Events such as a million dollar baccarat tournament, Chinese New Year event with live entertainment and catered banquet, Asian Christmas concert with live entertainment and drawings for prizes, a variety of premium blackjack, craps, slot and video poker tournaments, and a high-end Christmas shopping program for established casino players are used to support selling activities.

Convention/Trade Show Marketing
The owner of The Venetian/Sands is Sheldon G. Adelson, the founder of COMDEX, which remains one of the largest trade shows in the world. Several employees from the Interface Group, who ran COMDEX, are now employed by The Venetian/Sands. Under Mr. Adelson, COMDEX events in Brazil, Canada, and France became the largest trade shows in those respective countries. COMDEX eventually launched events in Asia, including COMDEX China in Beijing, COMDEX Asia in Singapore, and COMDEX Japan in Tokyo.
The Venetian/Sands organization has relationships with the largest trade show organizers in the world, including Reed exhibitions, Advanstar, VNU expositions, Hanley Wood, as well as numerous associations, such as the National Association of Broadcasters, the Sporting Goods Manufacturers Association, and the Automotive After Market Industry Association. The Venetian plays host to 25 of the Tradeshow 200 shows (the 200 largest shows in the United States).

The Venetian employs 25 sales representatives that "sell" the group/convention market into our complex.

The Venetian/Sands advertises in many of the top meeting publications, including Meetings and Conventions, Meetings West, Corporate and Incentive Travel, Convene, MPI publications, EXPO magazine, OMFG (Official Meeting and Facilities Guide) as well as several others. The Venetian sends direct mail to all exhibitors in trade shows held in Las Vegas with a call to action that includes the sales telephone number, email address, and Venetian's web site address. This past August (2001), The Venetian hosted MPI's annual WEC conference and played host to several thousand meeting planners (members of MPI) from around the world.

The Venetian has earned numerous awards from the meetings industry. They include Meeting and Convention's Gold Award for 2001, which honors the best properties, food and beverage services, and convention and visitors bureau, as voted by the readers of their magazine. In addition, The Venetian was named the "Best of the West" in 2000 by the readers of Meetings West magazine. In addition, The Venetian was recognized as the 1999 "Planner's Choice" Award by Meeting News magazine.

With our the vast knowledge of the Asian market, combined with our extensive work with international tradeshow companies and our vast experience with airlines and the travel industry, our marketing efforts for this project will initially focus on utilizing and expanding upon existing gaming, convention, and travel industry database contacts and programs.   Additionally, customized marketing programs will be implemented to lure business and convention travelers to Macau, and increase mid-week occupancy and visitation to the area.   Further, we intend to create and maintain a marketing fund based on operating cash flow.   With this fund, AAEC will create its own Tourism Promotion Department and preside over wide-reaching marketing campaigns that will generate tourists, conventioneers and gamblers to Macau.

### 16. Premium and Contributions

A.   Pursuant to Articles 3 and 4 of Administrative Regulations No.26/2001, and Article 12.1 of the Tender Procedures, AAEC proposes that the total amount of premium payable for the award of the concession to operate casino games of chance shall be US$10,875,000 (United States dollars ten million eight hundred and seventy five thousand)/patacas 87,000,000 (patacas eighty seven million), payable annually and subject to the adjustment mechanism referred to below, and shall consist of the following:

   (i)   The fixed portion equal to 30,000,000 patacas (patacas thirty million), as published in the "Announcement of the Macau Special Administrative Region"; and

   (ii)  The variable portion equal to US$7,125,000 (United States dollars seven million one hundred and twenty five thousand)/57,000,000 patacas (patacas fifty seven million) which has been determined on the basis of the criteria set out in Article 4 of Administrative Regulations No.26/2001 as follows:

   -   Criteria (1) (e.g. The number of casinos permitted to be operated by each concessionaire).   The variable portion has been determined on the basis of numbers of gambling tables and slot machines (see below) rather than the number of casinos.

   -   Criteria (2) (e.g. The number of gambling tables permitted to be operated).   For the purposes of this criteria, premia have been allocated to gambling tables and slot-machines as follows:

      (a)  Premium per gambling table located in Macau (excluding Taipa and Coloane): US$10,000 (United States dollars ten thousand)/patacas 80,000 (patacas eighty thousand);

      (b)  Premium per slot machine located in Macau (excluding Taipa and Coloane): US$2,000 (United States dollars two thousand)/patacas 16,000 (patacas sixteen thousand);

      (c)  Premium per gambling table located in Taipa: US$7,500 (United States dollars seven thousand five hundred)/patacas 60,000 (patacas sixty thousand);

      (d)  Premium per slot machine located in Taipa: US$1,500 (United States dollars one thousand five hundred)/patacas 12,000 (patacas twelve thousand);

(e) It has been assumed that 50 gambling tables and 500 slot machines will be located in Macau (excluding Taipa and Coloane) and 250 gambling tables and 2,500 slot machines will be located in Taipa.   The variable portion of the premium will be adjusted by reference to the actual number of gambling tables and slot machines included in the proposed developments when finalised and will be adjusted by reference to subsequent changes.

- Criteria (3) (e.g. The types of gambling permitted to be operated).   For the purposes of criteria (3), no distinction has been made between the types of gambling permitted to be operated.

- Criteria (4) (e.g. Locations of the casinos).  Location has been taken into account in relation to gambling tables and slot machines (see criteria (2) above).

(iii) The total amount of premium payable and the payments referred to in 16B and C below have been determined on the following understandings and assumptions:

(a) The total number of gambling tables and slot machines permitted to be operated by all concessionaires will be subject to a satisfactory limit;

(b) AAEC will be permitted to operate a fair, proportionate and equitable number of the total referred to in (a) above;

(c) The total number of concessions to operate casino games of chance will not exceed three;

(d) The duration of the concession awarded to AAEC shall be twenty years with options to extend for successive periods of five years;

(e) The concession will provide AAEC with flexibility in determining the types of games to be played on the gambling tables and slot machines to which the concession relates and to alter the configurations of gambling tables and slot machines on each site.

(f) The variable premium and payments referred to in 16B and C below will not be payable until the gambling tables and slot-machines are in operation;

(g) The variable premium and payments referred to in 16B and C below will be paid either in cash or in the form of direct investments, expenditures or projects in Macau by AAEC or its shareholders (including CDIB) or any of their affiliates or investors.

B.  Pursuant to Article 22.7 of the Law No. 16/2001, AAEC proposes to make yearly contributions to non-profit institutions whose goal is to promote, develop, or study culture, society, economy, education, science, academics, and charitable activities equal to one and two tenths per cent (1.2%) of gross revenue from gaming related to all of AAEC's permanent and temporary facilities.

C.  Pursuant to Article 22.8 of the Law No. 16/2001, AAEC proposes to make a yearly contribution to the development of city construction, tourism promotion and provision of

social security equal to one and eight-tenths of one percent (1.8%) of gross revenue from gaming related to all of AAEC's permanent and temporary facilities.

The payments referred to in 16B and C above have been determined on the understandings and assumptions referred to in 16A (iii) above.

**EXHIBIT B**

To: The Tender Commission ("Comissão do primeiro concurso público para a atribuição de concessões para a exploração de jogos de fortuna ou azar em casino, Governo da Região Administrativa Especial de Macau da República Popular da China")

# Galaxy Casino Company Limited

## Subsequent Proposal

## For the First Public Tender for a Concession for Operating Games of Chance or Other Games in Casino in Macau

Galaxy Casino Company Limited ("Galaxy"), a company incorporated in Macau, with registered office at Avenida da Praia Grande, n°409, China Law Building, 25th Floor, Register Number 15066, hereby represented by its director, Mr. Pedro Ho alias Ho On Chun, is willing and undertakes to enter into an agreement with the Macau Government under which a concession for operating games of chance or other games in casino in Macau is granted by the Macau Government to Galaxy Casino Company Limited in the terms and conditions referred in this Subsequent Proposal as follows:

   1.  The **premium** proposed remains the same as mentioned in the

Galaxy's Proposal submitted on December 7, 2002 (the "Said Proposal"), duly adapted if necessary.

2. The **contributions** referred in subparagraph (7) and (8) of Article 22 of Law n° 16/2001 shall also remain the same as mentioned in the Said Proposal

3. With regards to the **experience in the management of the operation of casinos**, it remains the same as described in the Said Proposal but now added by the enormous experience of "Venetian Venture Development, LLC" which Galaxy Casino Company Ltd." intends to contract as Managing Company as per communications submitted today to the Commission.

4. Regarding the **relevance of this Subsequent Proposal in respect of the development of employment in the gaming industry as well as professional training** it remains the same as stated in the said Proposal, combined with the training program offered by the "Venetian" as more particularly described in Annex A.

5. In respect of the **investment proposals of relevant interest to Macau** that the Applicant intends to accomplish according to this Subsequent Proposal, they are described in the Annex A enclosed herewith.

Macau, February 1, 2002

Cartório do Notário Privado RICARDO SÁ CARNEIRO
Reconheço a assinatura supra de Pedro Ho aliás Ho On Chun, e certifico que foi feita na minha presença pelo signatário, cuja identidade verifiquei por exibição do Bilhete de Identidade de Residente de Macau n° 5/0157122, emitido em 12/4/99, pelos Serviços de Identificação de Macau, na qualidade de administrador e em representação da sociedade denominada "Galaxy Casino S.A.", qualidade e poderes para o acto conforme verifiquei por exibição de uma certidão do registo comercial emitida em 4 de Dezembro de 2001.
Macau, aos 1 de Fevereiro de 2002.
O Notário,

Conta n° 145                                         $14.00

**ANNEX A**

**EXECUTIVE SUMMARY**

1.    **Introduction**

Galaxy Casino Company Limited's (GCCL) bid for a casino license in Macau represents a powerful opportunity for Macau to revitalize its casino tourism based economy and to fundamentally strengthen, broaden and diversify its entire economic base. At its completion, GCCL's themed destination resort alone would:

(i)    bring over US$1.1 billion (8.8 billion patacas) of investment;
(ii)   employ over 7,000 people; and
(iii)  generate as much as a 20% boost to Macau's GDP.

GCCL's vision begins with a world class resort that will attract tourists to:

(i)    its all superior rooms;
(ii)   its themed architecture;
(iii)  the exciting entertainment along its festive Venetian Grand Canal;
(iv)   the tropical river and waterfalls of its pool and spa complex;
(v)    shopping, dining and live entertainment showrooms; and
(vi)   world-class exhibition and conference facilities.

GCCL's vision begins with a temporary facility, follow with a comprehensive trade show exhibition and convention center as more particularly described in the Letter (as defined below). This facility, combined with our convention and tradeshow expertise, will enable us to stimulate midweek tourist trade in Macau. Importantly, this convention and exhibition center will present the products of China to the world's buying community.

GCCL has committed no less than US$400 million (3.2 billion patacas) to immediately begin the development of our vision.

2.    **Experienced Operator**

The Venetian will manage the Project with an experienced and highly successful management team that is well-known for its excellence and integrity in the industry. Additional information on this management team has been provided to the PTC.

The Venetian Resort owns and operates the Venice-themed resort situated on the Las Vegas Strip in Las Vegas, Nevada. The Venetian (Las Vegas) includes 3,036 luxury suites, a gaming facility of 116,000 sq. ft., an enclosed retail, dining and entertainment complex of approx. 450,000 sq. ft. and a meeting and conference facility of approx. 500,000 sq. ft. The Venetian (Las Vegas) is physically connected to the Sands Expo and Convention Center, one of the largest trade show and

convention facilities in the U.S., and together, have approximately 1,500,000 sq. ft. of exhibition and meeting space.

The Venetian cost over US$1.3 billion (over 10 billion patacas) to build and opened in 1999. The property generates US$590 million (4.72 billion patacas) in net revenues for the year ended 31 December 2000 and is one of the most successful casino establishments in Las Vegas. The Venetian is owned by Mr. Sheldon G. Adelson, one of the most successful and wealthy businessmen in the U.S. Mr. Adelson's numerous privately-held corporations range from technological enterprises to leisure resorts – among them, the Sands Expo and Convention Center, the only privately-financed, developed and operated convention center in the U.S. In April of 1995, as Chairman of the Board and C.E.O. of the Interface Group, Mr. Adelson and his partners pioneered the largest transaction in the history of the worldwide trade show industry by selling Interface's trade show division, including COMDEX, to a Japanese corporation for nearly US$900 million (7 billion patacas).

3.     **Overview of Gaming, Convention and Entertainment Project**

Overview

Our vision is a master-planned multi-phased casino, tradeshow/convention and entertainment complex as described in the draft letter submitted to the Public Tender Commission ("PTC") on February 1st, 2002 (the "Letter") which remains subject to the approval of GCCL and the Venetian.

Phase I

Initially, Phase I would include 500 rooms, exhibit, conference and multi-purpose complex space (as further described in the Letter) which will be expanded as the convention and exhibition market for Macau is developed. Similar to the retail facilities at the Venetian, Las Vegas, the complex would include a themed shopping complex. In addition, a live entertainment showroom and health club, spa and gymnasium is planned. The outdoor areas would include tropical gardens, lagoons, pools, waterfalls and other amenities.

The casino hall will be reflective of a large, luxurious, Las Vegas-style casino with a wide mix of gaming tables and slot machines. It will be surrounded by restaurants, entertainment venues and shopping experiences. The project will include back of the house support facilities and parking for 1000 cars.

Future Development

Subsequent additional phases of development will include the expansion of the convention and exhibition space, additional five-star luxury hotel rooms, restaurants, stores, and entertainment room. This additional investment will be made as the market demands.

Proposed Site

No definitive site for the project has been selected. However, GCCL has identified a 160-acre plot of reclamation land on the southeastern part of the Taipa Island.

Located just east of the Rotunda da Estrada do Istmo, it is about 5 minutes from the airport and the proposed new ferry terminal. It also is close to the Lotus Bridge that connects Macau with China. This land links Mainland China to Macau and Macau's airport and passenger port transportation infrastructure, and provides land parcels large enough for Las Vegas-style tourist attractions. By bridging Mainland China to the transportation amenities of Macau, the new development would provide convenient access for tourists, and act as a cluster of attractions to develop into a tourism magnet for Macau.

## Market Positioning

The Venetian Project will appeal to a diverse group of customer segments. The property will offer a quality entertainment experience superior to anything currently available in Asia. The property will appeal to the existing Hong Kong and Macau markets and, additionally, will expand the existing customer base by providing a safe, attractive Las Vegas-quality environment. The property will specifically target business and convention travelers from all over Asia as well as higher-budget customers seeking a quality destination vacation experience. The hotel suites proposed for the project will enable the casino to aggressively market customers who will stay for longer periods than the average visitation of existing customers to Macau.

With our vast knowledge of the Asian market, combined with our extensive work with international tradeshow companies and our experience with airlines and the travel industry, our marketing efforts will initially focus on utilizing existing gaming, convention and travel industry database contacts. Additionally, we intend to create and maintain a marketing fund based on operating cash flow. With this fund, GCCL will create its own tourism promotion department and preside over wide-reaching marketing campaigns that will generate tourists, conventioneers and gamblers to Macau.

## Temporary Facility

GCCL plans to open a temporary facility as soon as possible, while the permanent facility is under construction. Further details in relation to this temporary facility (the City Club) are included in the Letter. This will provide an excellent training facility for our future staff, further reduce unemployment, and create additional revenue to Macau. This temporary facility will be of very high quality and may continue to operate after completion of the permanent facility. Permission to develop additional gaming facilities may be requested as the market demands.

## Design

The Venetian intends to retain the Jerde Partnership International, Inc., one of the world's leading architectural firms. Since 1977, the Jerde Partnership has developed some of the world's leading structures, including Las Vegas' own Bellagio Reports (cost: US$1.9 billion (15 billion patacas); opened: 1998), Fukuoka, Japan's Canal City Hakata (cost: US$1.4 billion (11,2 billion patacas); opened: 1996) and Minnesota's Mall of America (cost: US$625 million (5 billion patacas); opened: 1992), to name a few.

Initial conceptual design materials depicting preliminary designs of the proposed project are included in GCCL's Tender materials for your reference. A diagram of the project master plan is attached to this summary.

## 4.   **Beneficial Impact on Macau**

### Project Capital Commitment

The total development cost of the Venetian (Macau) is estimated to be US$1.1 billion (8.8 billion patacas). The Project will be constructed in Phases. Phase I is estimated to be approximately US$400 million (3.2 billion patacas).

### Introduction of International, Public, Regulated Sponsors

The operation of casinos by US operators anywhere in the world must be conducted to meet the stringent regulatory standards of US gaming authorities. The Venetian in Las Vegas and its gaming operations are subject to extensive regulations by the Nevada Gaming Commission. The Venetian's securities are regulated by the U.S. Securities and Exchange Commission and its senior executives are individually licensed. As world-class gaming operators and to guard against any violation that may jeopardize the Venetian's gaming license, the company has adopted a series of internal controls or self-regulation, that ensure that all management and employees comply with certain policies and controls. **The policy of the Venetian is to conduct its business with honesty and integrity and in compliance with the highest legal and ethical standards. Management of the operations of the Venetian Casino (Macau) will be conducted to meet the high standards of the Venetian (Las Vegas).**

### Broadening the Business Model

GCCL proposes to develop a very different business to the existing casino operations in Macau. The business model will resemble the Venetian Las Vegas where, unlike its competitors, 60% of the business profits are derived from convention, hotel, resort and entertainment activities and only 40% is derived from gaming. **This model will have the greatest positive impact on Macau's economy and create the greatest economic diversification and opportunity for growth.**

What will truly differentiate this Project, in both design and operation, will be its emphasis on the convention, conference and business traveler market. **This emphasis is critical to increasing mid-week occupancy for all Macau hotels and generally diversify and grow the Macau economy.**

### Positive Impact on Macau Labor Force

Upon full implementation of this bid, over 13,000 jobs will be created. This employment increase will introduce leading casino systems management and operating skills as well as those relating to marketing, accounting and hospitality management.

5

Economic Impact on Macau

As noted above, Gaming tax will generate significantly higher revenues to Macau than current gaming tax receipts.

Non-gaming profits, a significant component of our planned project, will generate incremental corporate tax for Macau.

5.    **Building a Convention/Exhibit-Based Casino Resort and Temporary Casino Facility**

It is anticipated that design, approval, and construction of a five-star Las Vegas-style hotel would be completed within three years. Given this time frame, we are also requesting permission to operate a temporary casino, dining, and entertainment facility while the permanent facility is under construction which could provide an excellent training facility for our future staff, further reduce unemployment in the area, and create additional revenue to Macau. We are in the process of identifying an appropriate currently vacant building in Macau which can be quickly retrofitted and developed as such a temporary facility, and which could be opened within one year of receiving the subject gaming concession. This temporary facility, although developed quickly, will be a major tourism attraction, focusing on upscale travelers and providing luxury amenities, and will likely continue to operate after completion of the permanent facility.

Phase 1 of the casino, conference, and entertainment facility (which is described briefly in the Letter) will include the following:

A. Hotel Guest Suites

The hotel would initially feature approximately 500 luxurious suites with all-marble baths and foyer, crown molding, fine fabric, two phone lines, a computer modem line with high speed internet access, fully stocked mini-bar, and an in-room safe.

B. Conference Rooms/Exhibition Hall/Multi-Purpose Facility

A large exhibit, conference and multi-purpose complex will be built with the ability to be expanded as the convention and exhibition market for Macau is developed. The primary advantage of The Venetian group (in addition to developing the largest resort in Las Vegas with over 800,000 square meters under one roof) is its experience in the conference/exhibition center business. The owner of The Venetian, Sheldon G. Adelson, created and developed the world's largest trade show, the giant high-tech Comdex exhibition. The Venetian operates the world's largest privately-owned conference/exhibition complex of 170,000 square meters in Las Vegas. The

combination of exhibition development and conference/exhibition management expertise with conference/exhibition centers in Macau, Beijing, and Las Vegas should rapidly develop a new tourism base for Macau that will further diversify its tourism economy.

C. Restaurants

Restaurants of Chinese and Western styles will be built near the casino halls, providing convenient service for tourists.

D. Shopping Center

Similar to The Venetian's Grand Canal Shoppes Shopping Center in Las Vegas (note: this is the **second most lucrative mall in the world** generating sales of nearly $1,000 US (8,032 patacas) per square foot of leased space), shops and stores will be arranged along a Venetian street-scene with stone walkways, canals, bridges, and The Venetian's famous singing gondoliers.

E. Live Entertainment Showroom

A luxurious showroom with flexible stage, lighting and sound will be built to present varied entertainment shows from the elaborate stage shows of Las Vegas to the nightclubs of the Pearl River Delta.

F. Health Spa, Gymnasium

Featuring saunas, steam rooms, and health and beauty treatments.

G. Garden Pool and River Ride

Tropical swimming lagoon, water gardens, waterfalls, circulating river attraction meandering through lush foliage of a tropical rain forest.

H. Art Museum

The Guggenheim Hermitage Museum located inside The Venetian in Las Vegas displays world-renowned art valued in the billions of U.S. dollars. The Venetian would propose to build a similar attraction for Macau through its affiliations with the Guggenheim in New York and The Hermitage in St. Petersburg and their affiliations with museums in Vienna and Shanghai. The Art Museum of Macau would display world-renowned collections of western and eastern art and artifacts bringing an additional element of culture and education to Macau's tourism appeal. This museum, like its sister facility in Las Vegas, will also have special art programs available for students in Macau schools.



I.  Entrance Feature

A large pool of water representing the sea approach to Venice greets the visitor upon arrival to The Venetian.  Fountains, waterfalls, and a floating restaurant add activities and interest to the arrival experience to transport the visitor to The Venetian experience.

J.  Casino

As more particularly described in the Letter.

K.  Back of House Support Facilities
L.  Parking  (For 1000 Cars)


*Expanding The Facility*


Additional phases of development would expand the exhibit center, add thousands of hotel rooms, restaurants, stores, and entertainment rooms, and make The Venetian a full Las Vegas entertainment destination in the heart of Macau.

Initial conceptual design materials depicting preliminary designs of the proposed project are included in GCCL's Tender materials for your reference.


6.  **Summary of Phase I**


Phase I development represents not only a $400,000,000 US (3.2 billion patacas) full-fledged convention-anchored destinations resort, but the beginning of a new Macau.  The Venetian Resort will be master-planned to include a huge convention/exhibition hall, thousands of all-suite rooms, restaurants, retail stores, entertainment rooms, and museums representing a total investment of over $1.1 billion US (8,8 billion patacas).


7.  **Jerde Partnership International, Inc. – Architect**

To help facilitate this development, The Venetian has retained the Jerde Partnership International, Inc., one of the world's leading architectural firms, well-known for designs of large-scale retail and mixed use projects that successfully create a sense of place and identity for cities world wide.  Since 1977, the Jerde Partnership has developed some of the world's leading structures, including Las Vegas' own Bellagio Resort (cost:  $1.9 billion US/15,260,799,217 patacas; opened: 1998), Fukuoka, Japan's Canal City Hakata (cost: $1.4 billion US/ 11,244,799,423 patacas; opened: 1996) and Minnesota's Mall of America (cost: $625 million US/5,019,999,742 patacas; opened: 1992), to name a few.

Projects of the Jerde Partnership have been recognized by the American Institute of Architects (AIA), the International Council of Shopping Centers (ICSC), and two ministries of the Japanese government, among many others.  With that in mind, the Venetian finds the

8



Jerde Partnership well-suited to make its vision for Macau a reality.  We have included additional background information on the Jerde Partnership for your reference.

## 8.   The Venetian Group - Experienced Management

The Venetian group's top management comprises the following executives.  Please note that they are highly experienced executives who have been licensed for many years in a variety of major gaming jurisdictions and thoroughly scrutinized and approved by the Nevada Gaming Control Board and other regulatory agencies.

> (i)     SHELDON G. ADELSON

CHAIRMAN OF THE BOARD

As Chairman of Las Vegas Sands, Inc. (LVSI), developer of the $1.5 billion US (12,047,999,382 patacas) Venetian Resort-Hotel-Casino, a 3,036 suite luxury resort, hotel, retail, casino and convention complex, *Mr. Sheldon G. Adelson* is a "Forbes 400" member and Las Vegas resident.  He is the sole creator of COMDEX, the world's largest trade show.  Known worldwide for his business acumen and visionary leadership, he is also the Chairman of G.W.V., a Needham, Massachusetts-based travel company and one of the largest regional travel wholesalers in the United States.

Mr. Adelson's numerous privately-held corporations range from technological enterprises to leisure resorts.  Among them, the Sands Expo and Convention Center, the only privately-financed, developed, and operated convention center in the United States.  In April of 1995, as Chairman of the Board and C.E.O. of The Interface Group, Mr. Adelson and his partners pioneered the largest transaction in the history of the worldwide trade show industry by selling Interface's trade show division, including COMDEX, to a Japanese corporation for nearly $900 million US.

COMDEX, under Mr. Adelson's creation and development, grew into what is now considered "the" premiere event for the worldwide computer and communications industry.  Since the sale of his trade show division, Mr. Adelson assumed sole ownership of LVSI and is currently overseeing The Venetian Resort-Hotel-Casino.

> (ii)    WILLIAM P. WEIDNER

PRESIDENT AND CHIEF OPERATING OFFICER

*Mr. William P. Weidner* has served as President and C.O.O. of LVSI since December of 1995.  A veteran hospitality industry executive, Mr. Weidner's responsibilities include directing all development activities of LVSI, including the planning, financing, construction, and implementation stages, and the creation, review and oversight of all programs, systems, departments, and functions related to the management and administration of LVSI.

Mr. Weidner is an M.B.A. graduate of Michigan State University.  After serving as Assistant Professor of Business Administration and Hotel Management at Smith College for 2-1/2 years, he spent eight years with the Marriott Hotel Group, receiving its prestigious "Man of the Year" award in 1975.

In 1978, Mr. Weidner joined Caesars in Atlantic City as Vice President of Hotel Operations, and was named Vice President of Marketing a year later. Recruited by the Pratt Organization in 1981, he went on to serve as Executive Vice President of the Greate Bay Casino Corporation, owner of the Sands Hotel and Casino in Atlantic City. In 1983, he was elected President of Greate Bay, and in 1985, President of the Pratt Hotel Corporation, Greate Bay's publicly traded corporate parent. He also served as President of Pratt's Hollywood Casino-Aurora subsidiary and sat on the Board of Directors of Pratt Hotel Corporation and Hollywood Casino Corporation.

(iii)   BRADLEY H. STONE

EXECUTIVE VICE PRESIDENT

As Executive Vice President of LVSI, *Mr. Bradley H. Stone* oversees the operations of The Venetian, as well as the development and construction for LVSI and all its subsidiaries. Mr. Stone is an experienced hospitality industry executive and a graduate of the prestigious Hotel School at Cornell University.

Beginning his career as a trainee at New York City's famed Plaza Hotel, Mr. Stone went on to management positions at Marriott's Essex House in New York and at Caesars in Atlantic City, where he served as General Manager.

Joining the Sands Hotel in Atlantic City as Director of Operations, Mr. Stone earned a series of promotions, first to Vice President of Hotel and Casino Operations, then to Executive Vice President, and finally to President and C.O.O., as well as Executive Vice President of the parent Pratt Hotel Corporation. Before joining LVSI, Mr. Stone was Chairman of the Casino Association of New Jersey.

(iv)   ROBERT G. GOLDSTEIN

**(V)   PRESIDENT**

(VI)   THE VENETIAN

As Senior Vice President of LVSI and President of The Venetian, *Mr. Robert G. Goldstein* is an experienced hotel casino executive with expertise in marketing and operations.

Mr. Goldstein is a graduate of the University of Pittsburgh and holds a law degree from Temple University. In 1981, Mr. Goldstein joined the Sands in Atlantic City as Director of Casino Marketing, earning a series of promotions and ultimately becoming Vice President of Marketing and Executive Vice President. He also served as Executive Vice President of Pratt Hotel Corporation.

(vii)   DAVID FRIEDMAN

ASSISTANT TO THE CHAIRMAN OF THE BOARD/COUNSEL/SECRETARY

As Assistant to the Chairman, *Mr. David Friedman* brings to LVSI and The Venetian, an extensive legal background. Mr. Friedman has extensive experience in developing, financing and operating gaming, hospitality and related projects. Mr. Friedman is a magna cum laude graduate of the University of Pennsylvania with a law degree from the Georgetown University Law Center.

After graduating law school, Mr. Friedman joined the corporate law department of a large law firm. He left private practice in 1983 to join the legal department of Bally's Park Place in Atlantic City, New Jersey. In 1988, Mr. Friedman left Bally's to become counsel to the Atlantic City law firm of Horn, Goldberg, Gorny and Daniels, which was retained by Merv Griffin to assist in the acquisition of Resorts International. After completing the acquisition, Mr. Friedman became Vice President and General Counsel to Resorts through 1993. Subsequently, he became Senior Vice President of Development and Legal Affairs for President Casinos, Inc., where he served until 1995, at which time he joined the Interface Group and LVSI in his present capacity, providing legal and other assistance to Mr. Adelson in his various business activities.

Mr. Friedman also serves as the Chairman of The Venetian's Compliance Committee. Additionally, Mr. Friedman has advised numerous governments on the establishment and regulation of gaming enterprises and drafted regulations and internal controls for the Gaming Industry which continue to serve as industry standards today. He also has extensive experience in training casino personnel, including his experience as the President of the largest gaming school on the East Coast of the United States.

HARRY D. MILTENBERGER

VICE PRESIDENT OF FINANCE

*Mr. Harry D. Miltenberger* began his career in public accounting and served a variety of publicly- and privately-held gaming companies, including The Golden Nugget, Primadonna, Boomtown, and the El Dorado.

In 1984, Mr. Miltenberger joined Golden Nugget, Inc.'s Las Vegas operating subsidiary, GNLV Corp., as Principal Financial Officer and Treasurer. His responsibilities included SEC reporting, financial reporting, forecasting, and budgeting. In 1987, Mr. Miltenberger became Chief Financial Officer and Treasurer of the Naiman Company, a San Diego-based nationwide developer of mixed-use office complexes and hotels.

In 1997, Mr. Miltenberger became Vice President of Finance for Las Vegas Sands, Inc., the developer of The Venetian Casino Resort. His responsibilities include financial reporting and accounting activity for the company, as well as its subsidiaries. Mr. Miltenberger is a California Certified Public Accountant.



11

Set forth below is a Corporate Organization Chart, which summarizes the above relationships:

**Las Vegas Sands, Inc.**

Las Vegas Sands, Inc.

- Compliance Committee
- Sheldon G. Adelson
  Chairman of the Board & CEO
- Internal Audit

- William P. Weidner
  President & COO
- David Friedman
  Assistant to the Chairman of the Board

- Bradley H. Stone
  Executive VP

- Harry D. Miltenberger
  VP Finance
- VP Development
- Robert G. Goldstein
  Senior VP

The Venetian in Las Vegas and its gaming operations are subject to extensive regulation by the Nevada Gaming Commission, the Nevada State Gaming Control Board and Clark County. The Venetian's securities are regulated by the United States Securities and Exchange Commission. Taken together, these regulators have broad authority with respect to licensing and registration of entities and individuals involved in gaming and disclosure of financial information. During operation, The Venetian Las Vegas may be required to disclose the identities of the holders of its securities to the Nevada Gaming Authorities upon request. The Nevada Commission may, in its discretion, require the holders of any securities of The Venetian to file an application, be investigated and be found suitable to hold these securities.

To guard against any violation that may jeopardise its gaming license, The Venetian has adopted a series of internal controls, or self-regulation, that ensure that all management and employees comply with certain stringent policies and controls. Stated simply, the policy of The Venetian is to conduct its business with honesty and integrity, and in accordance with proper legal and ethical standards. The Venetian has produced a Compliance Policy which is administered by a Compliance Committee, and which sets forth responsibilities of all Venetian executives and employees. A copy of this Compliance Policy is attached for your information. A similar policy tailored to Macau operations will be implemented by GCCL.

## 10. The Venetian Business Model

The Venetian assures high occupancy and higher average daily room rates year-round with the 1.7 million square foot combined Sands Expo and Congress Center – **making The Venetian campus the largest combined meeting, conference and hotel facility in the world.** In that respect, The Venetian is different from all other Las Vegas mega-resorts in



that its own meeting facilities enable it to displace weaker mid-week tour and travel customers with higher-value convention and trade show attendees.

The Venetian's luxury, all-suite rooms cater to a higher-budget customer mix composed of premium casino players and higher-end business and free and independent travelers. On the highest occupancy weekends, players will be assured a suite at The Venetian when they may not receive one at other Strip resorts that have limited suite inventory. Additionally, the Sands Expo and Convention Center continues to bolster mid-week occupancy throughout Las Vegas, as it has since it opened in 1990. **GCCL will bring a very similar business model to Macau to assure maximum diversification of the economy, job creation, and positive economic impact.**

In addition to the seven high-quality restaurants in the mall, the casino floor features six high-end brand-name restaurants including Zagat's #1 restaurants: from San Francisco, Postrio; from Los Angeles, Pinot and Valentino; from New York, Lutece; and from New Orleans, Emeril Lagasse's new Delmonico Steak House. This name-brand "restaurant row" concept draws upscale visitors and gaming "high rollers."

The Venetian has dispelled yesterday's assumptions and created a new Las Vegas that attracts millions of new visitors who might normally head for other resort destination cities, such as Palm Springs, San Francisco or Scottsdale.

Unlike other hotel operators in Las Vegas, The Venetian derives 60% of its profit from hotel, resort and conference operations, while just 40% stems from gaming. By contrast, other so-called Las Vegas "strip" hotels generally rely on their casinos for over 50% of their profits.

And, the awards keep coming in…

## 11.Awards Bestowed Upon The Venetian

| | |
|---|---|
| Top 100 Hotels in the Continental US & Canada | *Travel & Leisure Magazine* |
| Ultimate 10 Hotels in the World | The Learning Channel |
| Grandest Hotels in the World (out of 10 hotels) | *London Sunday Mail* |
| Best Business Hotels (out of 7 hotels) | *American Way Magazine (American Airlines)* |
| Largest Standard Hotel Room in the World | *Guinness Book of World Records* |
| Best of the West (out of 50 hotels) | *Meetings Magazine* |
| Image of the Year Award (for six uniforms) | Nat'l Assoc. of Uniform Manufacturers & Distributors |
| 2000 Gold Key Award | *Meetings & Conventions Magazine* |
| 1999 Planners' Choice Award | *Meeting News* |
| Best Architecture | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Hotel Lobby | *Las Vegas Review-Journal--Best of 2000 Awards* |

| | |
|---|---|
| Best Amusement Attraction—Gondola Rides | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Place to People Watch—Grand Canal Shoppes | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Hotel Shop—Celebration of Golf | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Individual Store—Ripa di Monti | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Asian Restaurant—Royal Star | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best Italian Restaurant—Zefferino | *Las Vegas Review-Journal--Best of 2000 Awards* |
| Best of Award of Excellence—Valentino | *Wine Spectator Magazine* |
| Award of Excellence—Delmonico | *Wine Spectator Magazine* |
| Best Chinese--Royal Star | *Las Vegas Life--Epicurean 2000 Awards* |
| Best Steakhouse—Delmonico | *Las Vegas Life--Epicurean 2000 Awards* |
| Best Desserts—Postrio | *Las Vegas Life--Epicurean 2000 Awards* |
| Top 10 Resort Spas in North America—Canyon Ranch | *Conde Nast Traveler Magazine* |
| Seven Best Fitness Day Spas—Canyon Ranch | *Shape Magazine* |

## 12. **Recruiting and Training**

The Venetian in Las Vegas is generally regarded as one of the best employers, if not the best employer, in Las Vegas. There are a variety of reasons for this.

The Venetian has created unique benefit plans for its staff (which it refers to as "team members") that are designed to help team members better balance their personal and professional lives, so when they are at work they are in the best possible frame of mind to serve the guest. The Venetian offers a Team Member Concierge, which provides a number of services that save people time they would have to spend running errands. The Team Member Concierge provides free copying, faxing and delivery of prescriptions and sells bus passes, stamps, greeting cards, notary public services, dry cleaning and car washing. Another popular service is having a representative of our benefits administration company on-site. If a team member has a question about a benefits claim, he or she can meet with a representative (who has on-line access to the claims system) and get the situation resolved quickly.



The Venetian was the first Las Vegas casino to offer on-site childcare. This benefit is greatly appreciated by team members who can stop in and see their children on their breaks. Childcare concerns can weigh on team members' minds and affect the level of service they provide. Knowing their child is receiving excellent care in the very same building removes this concern so team members can focus their attention on our guests' needs. The Venetian offers a free wellness center that is open 24 hours, 7 days a week to make it convenient for people to work out and stay healthy. As part of the wellness program The Venetian also offers subsidized Weight Watchers classes.

The Venetian supports team members who are experiencing serious personal challenges. It provides an Employee Assistance Program that goes beyond the norm. The program offers free counseling visits. It also provides referrals to experts for people who are having stressful situations involving legal, financial, or family issues.

Another unusual benefit is having a Community Services Representative within the Human Resources Department. This person is an expert on services available through various community agencies and programs. When team members are facing a personal problem, they can obtain confidential assistance in finding resources to help them.

People tend to be more committed to an organization when they are involved and they feel their concerns are listened to and their ideas are valued. The Venetian uses a variety of methods to get team members involved in making The Venetian a great place to stay and to work.

The Venetian's President conducts "Coffees with the President" in which he meets for about an hour with ten to 15 team members from various departments two or three times a week. He also meets with managers for "Lunches with the President" twice each month.

The Human Resources Department conducts regular meetings with groups of team members and managers to get feedback on how things are going and suggestions for improvement. Issues are then discussed and, when possible, resolved at monthly "Work Environment Improvement Meetings," which involve the key operational Vice Presidents and Directors. The Venetian communicates responses to all the issues raised so team members know that their concerns can be effectively addressed.

The Venetian has a positive discipline process that focuses on building team member commitment to change, and which includes a Peer Review system that involves team members in reviewing any terminations or suspensions for fairness.

Included with this Tender submission is additional information regarding certain community outreach and training programs at The Venetian, which have helped to make The Venetian the most admired and respected employer in Las Vegas by Las Vegas' workforce. Similar programs, tailored to Macau operational requirements, would be instituted by GCCL. Also included is a preliminary management organization chart and staffing plan for the project.

## 13. Educational Outreach

15 

With expertise provided by The Venetian and guided by David Friedman, who at one point during his career was the president of the largest casino school on the East Coast, The Venetian will work with all schools in Macau, such as the University of Macau, Macau Polytechnic Institute, the Institute For Tourism Studies, Inter-University Institute of Macau, Asia International Open University (Macau), The Institute of European Studies of Macau, United Nations University – International Institute for Software Technology, Macau University of Science and Technology, and Macau Institute of Management in developing a variety of educational outreach programs.  The Venetian will become a corporate partner with these institutions to ensure the resources of the project will be accessible to Macau residents and workers.

### 14.  Bringing Cultural Attractions – The Guggenheim and Hermitage Museums

In October, The Solomon R. Guggenheim Foundation opened two museums in Las Vegas at The Venetian: **the Hermitage Guggenheim Museum,** a 7,660-square-foot museum for the presentation of the collections from the Solomon R. Guggenheim Foundation, New York and The State Hermitage Museum in St. Petersburg, Russia; and the **Guggenheim Las Vegas,** a 63,700-square-foot facility for the presentation of special large-scale exhibitions.  The two new buildings have been designed by Rem Koolhaas, a Dutch architect and winner of the prestigious 2000 Pritzker Prize.

The Guggenheim Hermitage Museum has been made possible through an alliance with The Venetian.  "The new Guggenheim Hermitage Museum and Guggenheim Las Vegas at The Venetian will be the cornerstone of the continuing cultural renaissance of Las Vegas," said Sheldon Adelson, Chairman of The Venetian.  "The Guggenheim is not the first cultural institution to have a presence in Las Vegas, nor is it the first occasion for world-class art to be seen in this city.  However, the components involved—the Solomon R. Guggenheim Foundation, the State Hermitage Museum, Rem Koolhaas, and Frank Gehry, joining forces with The Venetian—make it by far the most compelling program to date."

The Guggenheim Hermitage Museum is located at the front of The Venetian, adjacent to the main entrance lobby.  The opening exhibition features important works from the collections of The State Hermitage Museum in St. Petersburg and the Solomon R. Guggenheim Foundation.  Subsequent exhibitions will be developed by the directors and curatorial staffs of the Guggenheim and Hermitage and will change approximately twice a year.  The Guggenheim Hermitage Museum is operated by the Solomon R. Guggenheim Foundation.

The inaugural exhibition at **The Guggenheim Hermitage Museum** presents a selection of 45 masterpieces that highlight the distinct but highly complementary strengths of these two world-renowned collections.  *Masterpieces and Master Collectors: Impressionist and Early Modern Paintings from the Hermitage and Guggenheim Museums* features key examples of Impressionism, Post-Impressionism, and early Modernism, including exceptional paintings valued at over $2 billion US (16,063,999,176 patacas) by Cézanne, Chagall, Kandinsky, Matisse, Monet, Picasso, Renoir, and van Gogh.

**The Guggenheim Las Vegas** was conceived for the presentation of special exhibitions, ranging from contemporary painting and sculpture, to architecture and design, and multi-media art.  "The exhibition spaces at the Guggenheim Las Vegas were inspired—in part—by the large gallery at the Guggenheim Museum Bilbao," said Mr. Thomas Krens, the Director

16

of the Guggenheim.  "In 1999, we presented nine steel sculptures by Richard Serra in that space, each piece weighing approximately 150 tons.  It was one of the most beautiful exhibitions I have ever experienced; the equation between objects and the Frank Gehry space was sublime.  From that point on, it was absolutely clear.  The challenge for the Guggenheim Las Vegas was to expand upon the Bilbao space in every way possible, with an emphasis on difference, context, flexibility, and practicality.  I believe that we have designed a space in Las Vegas that is absolutely unique.  Rem Koolhaas brings an industrial aesthetic, an impeccable precision, and a powerful sense of space and humor to all aspects of the design."

The main gallery in the 63,700-square-foot building is approximately 210-feet-long, 160-feet-wide, and 70-feet-high.  The largest gallery features a 70-foot by 70-foot pivoting door, as well as a functioning industrial bridge crane—hovering close to the ceiling and suspended from tracks at either side of the space—with a lifting capacity of 35 tons.  The main floor of the large gallery is breached by a 210-foot by 30-foot trench, which can either be covered with 21 five-ton trench covers to create a single level, or the trench covers can be selectively removed to reveal the galleries on the lower level.  The lower level is accessed either by escalators or via a lime green processional staircase 30-feet-wide.  A skylight in the ceiling—12-feet by 70-feet—features motorized trap covers, located on the roof, which can either filter out all natural light or be fully open to the sky.  A media wall that is 60-feet-high and 120-feet-wide comprises the northern wall of the main gallery.

The inaugural exhibition of the Guggenheim Las Vegas is *The Art of the Motorcycle*, first presented at the Solomon R. Guggenheim Museum in 1998 and one of the most successful art exhibitions in history.  With more than 130 motorcycles on display, the exhibition chronicles the most compelling moments in motorcycle design and technology—from its humble beginnings as a steam-powered vehicle to the sophisticated state of motorcycle production today.  The exhibition both explores and celebrates the motorcycle as a quintessential symbol of the Modern age.

Included in our Tender materials is an additional information package regarding the Guggenheim museums.  This is an example of the type of cultural program The Venetian has developed in Las Vegas.  It is anticipated that similar cultural attractions and facilities would be developed by GCCL in Macau that would be accessible to Macau residents and students.

### 15. Marketing Expertise

Brand Identification

In only two and one-half years of operation, The Venetian Hotel and Casino has become recognized worldwide as a leading convention and casino destination resort taking its place as one of the major brand names on the Las Vegas strip.

The Venetian has appeared on every network and cable television broadcast in the United States as well as major networks in Europe, Asia and South America.  Non U.S. television exposure includes China T.V., Taiwan T.V., FTV, CTS, CTN, KNUV and many others.  Articles on The Venetian have appeared in every major magazine and daily newspaper including Time, Newsweek, Forbes, Business Week to USA Today, Wall Street Journal, New York Times, Los Angeles Times,  CDN Magazine and The Great Daily News.  As an example, more than 1,000 stories, television segments, and radio broadcasts were generated from the opening of The Venetian alone, resulting in nearly 200 million media impressions world-wide.  More recently, the opening of two Guggenheim museums at The Venetian

resulted in over 300 media attendees from the United States, Europe, Asia, and South America. The result: major network and cable television exposure and front page print reviews culminating in thousands of stories equaling millions of dollars of publicity exposure. It's worthwhile to note that The Venetian has been featured on unprecedented six one-hour documentaries: "The Secrets of Venice in Vegas" (Travel Channel); "On the Inside: The World's Largest Hotel" (Discovery Channel); "King of the Strip" (The Learning Channel); "High Rollers" (E-Entertainment); "Modern Marvels – The Venetian" (The History Channel); and "Future Makers" (Discovery Channel). These one-hour specials are a part of cable programming that rotates as many as 15 times per year resulting in additional millions of exposures for The Venetian Brand. Since opening in 1999, The Venetian has been recognized as one of the "10 Ultimate Hotels in the world" (The Learning Channel); "One of the Ten Grandest Hotels in the World" (London Sunday Mail); "One of the Top 100 Hotels in the World" (Travel and Leisure Magazine); "One of the Seven Best Business Hotels" (American Way Magazine); "One of the World's Best Places to Stay in the World" (2001 Gold List – Conde Nast Traveler), and the list goes on.

Marketing Activities:  Since its opening, The Venetian has spent over $40 million U.S. in direct advertising in American and international markets in major newspapers, magazines, billboards and in television advertising. The Venetian sent over 1,176,000 pieces of direct mail to date in the year 2001 alone. In its casino database of over 700,000 players, Asian players represented over 20% of the casino table games volume. Almost 250,000 e-mail promotional communications have been sent since September 11th to re-energize demand efforts after that tragic event. The Venetian's web site averages over 18 million visits per month, over 15% of these visitors are from outside the U.S.

Casino Marketing
The Venetian employs more than 38 casino sales representatives. Each executive spends 4-6 hours per day telemarketing to targeted casino players. Player packages, entertainment offers and special events (boxing matches, Hollywood star gatherings, famous athletes' events, etc.) are used as promotional vehicles to invite casino guests to visit The Venetian.

Asian Marketing Initiatives
The Venetian Asian Marketing Department has 16 full time employees. The Asian Player Services Marketing Department provides comprehensive coverage of the casino floor, assists Asian guests with any service issues. The staff has multiple language capabilities, including Japanese, Korean, Mandarin and Cantonese. A multi-lingual Butler team provides assistance to all premium casino players. The Department also has extensive associations with independent agents, who represent domestic and international players from all over Southeast Asia. A retail shopping discount program with the Japanese Travel Bureau (JTB) in Grand Canal Shoppes augment these efforts.

Asian Offices/Reps, Cities/Activities
Current office locations are in Hong Kong and Taiwan, as well as Vancouver, British Columbia and Monterey Park, California. Offices coordinate sales activities under direction of the Marketing Office located in Las Vegas. Each Branch Office is staffed with an executive, a marketing representative and an administrative assistant. There are also 13 commissioned representatives throughout Southeast Asia, who coordinate player trips and in-market parties.



18

Venetian Executives from Las Vegas make several sales trips to Southeast Asia annually with high-level executive personnel and casino sales personnel to promote The Venetian throughout the region.

Asian Special Events such as a million dollar baccarat tournament, Chinese New Year event with live entertainment and catered banquet, Asian Christmas concert with live entertainment and drawings for prizes, a variety of premium blackjack, craps, slot and video poker tournaments, and a high-end Christmas shopping program for established casino players are used to support selling activities.

## 15.    Convention/Trade Show Marketing

The owner of The Venetian/Sands is Sheldon G. Adelson, the founder of COMDEX, which remains one of the largest trade shows in the world. Several employees from the Interface Group, who ran COMDEX, are now employed by The Venetian/Sands. Under Mr. Adelson, COMDEX events in Brazil, Canada, and France became the largest trade shows in those respective countries. COMDEX eventually launched events in Asia, including COMDEX China in Beijing, COMDEX Asia in Singapore, and COMDEX Japan in Tokyo.
The Venetian/Sands organization has relationships with the largest trade show organizers in the world, including Reed exhibitions, Advanstar, VNU expositions, Hanley Wood, as well as numerous associations, such as the National Association of Broadcasters, the Sporting Goods Manufacturers Association, and the Automotive After Market Industry Association. The Venetian plays host to 25 of the Tradeshow 200 shows (the 200 largest shows in the United States).

The Venetian employs 25 sales representatives that "sell" the group/convention market into our complex.

The Venetian/Sands advertises in many of the top meeting publications, including Meetings and Conventions, Meetings West, Corporate and Incentive Travel, Convene, MPI publications, EXPO magazine, OMFG (Official Meeting and Facilities Guide) as well as several others. The Venetian sends direct mail to all exhibitors in trade shows held in Las Vegas with a call to action that includes the sales telephone number, email address, and Venetian's web site address. This past August (2001), The Venetian hosted MPI's annual WEC conference and played host to several thousand meeting planners (members of MPI) from around the world.

The Venetian has earned numerous awards from the meetings industry. They include Meeting and Convention's Gold Award for 2001, which honors the best properties, food and beverage services, and convention and visitors bureau, as voted by the readers of their magazine. In addition, The Venetian was named the "Best of the West" in 2000 by the readers of Meetings West magazine. In addition, The Venetian was recognized as the 1999 "Planner's Choice" Award by Meeting News magazine.

With our the vast knowledge of the Asian market, combined with our extensive work with international tradeshow companies and our vast experience with airlines and the travel industry, our marketing efforts for this project will initially focus on utilizing and expanding upon existing gaming, convention, and travel industry database contacts and programs.

19

Additionally, customized marketing programs will be implemented to lure business and convention travelers to Macau, and increase mid-week occupancy and visitation to the area. Further, we intend to create and maintain a marketing fund based on operating cash flow. With this fund, GCCL will create its own Tourism Promotion Department and preside over wide-reaching marketing campaigns that will generate tourists, conventioneers and gamblers to Macau.

**EXHIBIT C**

| HISTORY AND REORGANIZATION |
|---|

## OUR CORPORATE REORGANIZATION

Prior to the Reorganization, the simplified shareholding structure of our major operating subsidiaries, the companies involved in the Reorganization and companies referred to in this prospectus was as follows:



(1)   According to the Macau gaming regulatory framework, 10.0% of each Subconcessionaire's issued share capital must be held by its managing director, who must be appointed by the applicable Subconcessionaire and must be a permanent Macau resident. VVDIL has entered into an usufruct agreement with Mr. Antonio Ferreira, the managing director of VML, whereby Mr. Ferreira agreed to create a usufruct over 10.0% of VML's issued share capital to the sole and exclusive benefit of VVDIL.

We were incorporated under the laws of the Cayman Islands on July 15, 2009. Prior to the Global Offering, a number of reorganization steps were taken in preparation for the Listing. The Reorganization steps are set out below:

- In the first stage of the Reorganization, on September 2, 2009, VVDI (I) and VVDIL entered into a sale and purchase agreement pursuant to which VVDI (I) agreed to sell and VVDIL agreed to purchase (i) the entire issued share capital of Cotai WaterJets (HK) at a consideration of HK$1.00; and (ii) the entire issued share capital of CotaiJet Holdings at a consideration of HK$1.00. Since the net asset values of both Cotai Waterjets (HK) and CotaiJet Holdings were